*Tamra Bowers v. CSAA Gen. Ins. Co.*

Case No. CIV-23-419-J,

US.D.C., W.D. Okla.

Expert Report of Mort G. Welch

February 9, 2024

**EXHIBIT 21**

**Bowers_Mort Welch 00001**

# TABLE OF CONTENTS

I.  Education………………………………………………………………………4

II. Experience And Qualifications………………………………………………4

   A.  History of Practice……………………………………………………4

   B.  Insurance Practice……………………………………………………..5

   C.  Published Decisions……………………………………………………8

   D.  Teaching Experience……………………………………………………8

III.  Prior Testimony………………………………………………………....9

IV.  Compensation………………………………………………………….....9

V.  Documents Reviewed……………………………………………………10

VI. Exhibits………………………………………………………………...10

VII.    History of Claim……………………………………………………...11

VIII.   The Bowers Policy………………………………………………….30

IX.     National Standards for Adjustment of Insurance Claims…………………….…………..31

   A.  Investigation Standards……………………………………………...………...32

   B.  Documentation Standard…………………………………………………40

   C.  Communication Standard…………………………………………….………...42

   D.  Insurer's Knowledge of Applicable Law……………………………………...43

2

**E. Evaluation Standard**……………………………………………………………**49**

**F. Negotiation Standard**…………………………………………………….…**54**

**G. Internal Insurance Company Standards**…………………………………..**56**

**X. Violations of Standards**……………………………………………….……**58**

**A.** ……………………………………………………………………………**58**

**B.** ……………………………………………………………………………**62**

**C.** …………………………………………………………………………..**63**

**D.** ……………………..……………………………………………………**63**

**E.** ……………………………………………………………………..…...**65**

**F.** ……………………………………………………………………..…...**66**

**G.** ……………………………………………………………………......**68**

3

**Bowers_Mort Welch 00003**

Dear Mr. Rowe:

This report is submitted to you in my capacity as an expert witness for your client, the plaintiff Tamra Bowers, pursuant to F.R.C.P. 26(b)(4).  I will refer to the plaintiff as "Bowers" and the defendant CSAA General Insurance Company as "AAA".

## I.  Education.

I received a Bachelor of Arts degree with Special Distinction from the University of Oklahoma in 1972 and was a member of Phi Beta Kappa.  I received a Juris Doctorate degree from the University of Texas School of Law in 1975.

## II.  Experience and Qualifications.

### A.  History of Practice.

I have been continuously engaged in the practice of law since 1975.  I was employed in 1975 and 1976 by a general practice law firm, Johnson and Davis, in Harlingen, Texas.  From 1976 to 1978, I was an associate with Cooper, Stewart, Elder, and Abowitz in Oklahoma City, a civil litigation firm that handled many cases on behalf of insurers and their insureds, as well as injured persons.  In 1978, I was a co-founder of Abowitz and Welch with the late Murray Abowitz and was a shareholder in this law firm, later known as Abowitz, Welch, and Rhodes, until 1995.  In 1995, I was a sole practitioner.  In 1996, I formed another law firm, Welch, Jones & Smith, P.C., with Laurie W. Jones, Associate Dean Emeritus at Oklahoma City University Law School, and Sherry L. Smith.  This firm became Welch and Smith, P.C. in 2000, and continues to this day.

4

I was a member of the State Bar of Texas from 1975 to 1977.  I have been a member of the Oklahoma Bar Association since 1976. I am admitted to practice in the United States District Courts for the Western and Northern Districts, the Tenth Circuit Court of Appeals, and the United States Supreme Court. I have also been admitted to practice *pro hac vice* in several state and federal trial and appellate courts in Arizona, Arkansas, California, Illinois, Iowa, Kansas, Missouri, New Jersey, New Mexico, Ohio, Pennsylvania and Texas.

I am a member of Insurance Section of the Oklahoma Bar Association.  I am a former member of the International Association of Defense Counsel, the American Bar Association, and the Oklahoma Association of Defense Counsel.  I have been selected for inclusion in *SuperLawyers* on the subject of insurance coverage for the State of Oklahoma for 14 consecutive years and have been AV rated by Martindale-Hubbell for over 30 years.

**B.  Insurance Practice.**

My practice consists in part of civil litigation of all types, including insurance coverage claims for insureds and insurers.  I have litigated hundreds of uninsured motorist (UM) coverage and bad faith cases. My practice also includes advising insurers, insureds, lawyers and public adjusters on insurance coverage issues and claims.  This advice has resulted in the preparation of an estimated thousand or more written opinions concerning a wide variety of issues arising as a result of claims made under insurance policies.  A significant part of this part of my practice from 1976 to date

**Bowers_Mort Welch 00005**

concerns uninsured motorist coverage. I have also reviewed and approved preparation of numerous coverage opinions by other lawyers under my supervision. My opinions have addressed nearly every aspect of uninsured motorist coverage.

I have evaluated liability and damages in hundreds of cases, more than half of which were cases based upon bodily injury or death.  Through my experience in insurance litigation, as an advisor to insurers, insureds, lawyers and public adjusters, and as a drafter of insurance coverage policy provisions, I have addressed claims and specific issues under umbrella and excess liability and property insurance policies, workers compensation and employer liability policies, motor carrier policies, personal and business auto policies, including uninsured motorist coverage, homeowners and farm owners policies, individual and group life, health, accident and disability policies and certificates, professional liability policies, directors and officers liability and corporate indemnification policies, commercial general liability and property coverage policies, inland marine floater policies, crime policies, builders risk policies, and reinsurance contracts.

I have supervised hundreds of investigations of insurance claims.  I also have personally conducted some such investigations when the expense was deemed warranted by a client.  I have trained adjusters and their supervisors concerning claims investigation techniques and procedures, the construction and interpretation of insurance policies, including uninsured motorist coverage, evaluation of claims, including uninsured motorist coverage claims, and standards for claims handling intended to comply with the covenant of good faith and fair dealing, and with insurance case and statutory law.  I have evaluated thousands of claim files, including uninsured motorist

Bowers_Mort Welch 00006

claim files, for insurers and insureds (and their lawyers) to determine if the files include all information appropriate to make a determination concerning coverage, liability, and damages or losses, whether the investigation and handling of the claim is consistent with the applicable law, the obligations of good faith and fair dealing, and insurance industry standards.  In addition, I have qualified as an expert witness on a wide variety of coverages, including uninsured motorist coverage.  Some of these cases are identified in Section III, *infra.*

I participated in drafting the anti-stacking provisions of auto uninsured motorist (UM) coverage subsequently upheld by the Oklahoma appellate courts in Withrow v. Pickard, 905 P.2d 800 (Okla. 1995); Breakfield v. Oklahoma Farmers Union Mut. Ins. Co., 910 P.2d 991 (Okla. 1995); and Kinder v. Oklahoma Farmers Union Mut. Ins. Co., 943 P.2d 617(Okla. 1997).

I have drafted and revised many other types of clauses for use in various insurance policies, including auto, homeowners, farmowners, dwelling, commercial lines, insurance agent's professional liability, commercial general liability, commercial property, and umbrella and excess liability coverages.  I have prepared drafts of entire business and personal auto policies.

I have presented client positions on insurance coverage issues to the Oklahoma Insurance Department (OID) and advised OID informally on insurance coverage issues.  I have participated in drafting proposed legislation relating to insurance in Oklahoma and Idaho, including an amendment to the Oklahoma Declaratory Judgment Act, 12 O.S. §1651, to permit declaratory

Bowers_Mort Welch 00007

judgments concerning issues arising under liability insurance policies, effective November 1, 2004.  This amendment brought Oklahoma's declaratory judgment law in line with the law of the vast majority of states and with the Federal Declaratory Judgment Act.  I also participated in the revision of the motor vehicle insurance laws in Title 47 of the Oklahoma Statutes contained in Senate Bill 1161, which was passed by the first regular session of the 2009 Legislature.

### C. Published Decisions.

See attached Exhibit 1 for list of cases.

### D. Teaching Experience.

I have lectured and prepared seminar materials for continuing legal education programs sponsored by Oklahoma Bar Association (OBA), Oklahoma Association of Defense Counsel, Oklahoma Trial Lawyers Association, University of Oklahoma School of Law, Oklahoma City University School of Law, and The Conference on Consumer Finance Law.  These presentations have been approved as continuing education programs for Oklahoma lawyers; Oklahoma, Texas and California adjusters; and Oklahoma insurance agents.  Selected titles include:  *Allocation of Fault-Identifying All Angles*, OBA CLE  (Feb. 1989); *Identifying and Using Insurance Coverages Commercial Liability*, OBA  CLE (Feb. 1990); *Documenting the Agreement,* OBA  CLE (Dec. 1991 and Mar. 1995); *Replacement Cost Property Insurance Coverage Without Replacement: Coblentz v. Oklahoma Farm Bureau Mut. Ins. Co.*; The Conf. on Cons. Fin. Law (Dec. 1996); *There are Many People Who Want Your Client's UM Money: Pitfalls in the Settlement of UM Claims*, OBA & Oklahoma Insurance Department approved CE (Oct. 2009); *Substantial Certainty*

8

*Tort Claims By Injured Employees Against Their Employers: What Workers Compensation Professionals Should Know*, 11th Annual Spring Insurance Update Seminar (April, 2010, Oklahoma City/Dallas), an Oklahoma Insurance Department approved CE; and *Basic Elements of Auto Liability Coverage and Case Law Restrictions, What Must be Proved to Prevail on a UM Claim, The Interface Between Auto Liability and UM Coverages when the Claim's Value Potentially Exceeds the Liability Coverage Limit,* Last Minute Continuing Legal Education (Leflore County Bar Ass'n. Dec. 16, 2010).  I was program planner and moderator for the OBA and Oklahoma Insurance Department approved CE seminar, *What The Other UM Seminars Didn't Tell you: How To Settle And (If All Else Fails) Try UM Cases* (Oct. 2009).

I also have served as an adjunct professor at the Oklahoma City University School of Law.

### III.  Prior Testimony.

See attached Exhibit 2 for cases in which I testified as an expert witness in insurance cases.

### IV.  Compensation.

I am charging your firm $295.00 per hour for my services as an expert witness on behalf of your client in this case.

9

## V. Documents Reviewed.

I reviewed the following documents prior to the preparation of this report:

1. AAA Oklahoma Personal Auto Policy OK5520544 issued by AAA in the names of William Bowers/Tamra Bowers, effective from September 23, 2020  to May 23, 2021;

2. AAA claim file for Bowers' uninsured motorist claim, and other documents produced by AAA;

3. Documents filed in *Bowers v. CSAA Gen. Ins. Co.*, Case No. CIV-23-419-J, U.S.D.C., W. D. Oklahoma (*Bowers*);

4. Written discovery responses of AAA in *Bowers;*

5. Insurance industry and governmental publications, actual and model insurance statutes and regulations, case law, and secondary insurance, legal and medical resources; and

6. Deposition of Megan Frantz.

**If I am furnished additional documents, deposition transcripts or other sources of information after the date of this report, I reserve the right to supplement this report based upon information obtained after the date of this report, with permission of the Court if required.**

## VI. Exhibits.

I anticipate using all or parts of some of the documents identified in Section V.

10

**Bowers_Mort Welch 00010**

## VII.    History of Claim

**12-16-20**    Tamra Bowers, 46 years of age, was driving her 2006 Chrysler car north on N.W.

82nd Street in Lawton, Oklahoma when a Ford Econoline van driven by William Armstrong exited

from a shopping center across all lanes of 82nd Street from Bowers' left going east. Bowers was

unable to stop without hitting the Ford. Bowers complained of pain in her right wrist. Armstrong

was cited for failure to yield. (Police Report, CSAA 438-441).


**12-16-20**    Bowers' husband took her to the emergency department at Southwestern Medical

Center in Lawton. She stated to staff: "I hurt my wrist when my right hand got caught in the

opening in the steering wheel…. She states that her right wrist slammed into the steering wheel

and got caught in the opening of the steering wheel. She reports pain to her right wrist radiating

up her arm and elbow. Patient is right-hand dominant." (ED Physician Record, *Id*. at 704).

The physical exam in the ED revealed "swelling…at the medial aspect of the right wrist",

"decreased range of motion, joint swelling" and "tenderness to palpation dorsally". (*Id.* at 707).

Bowers was given pain medication preparatory to application of a splint to her right arm. X-rays

before and after application of the splint showed "an acute, comminuted impacted dorsal radius

metaphysis fracture with…dorsal displacement and dorsal angulation of the dorsal fracture

fragment." (711).

11

A "fracture to the radius occurs when the radius—one of the two bones in the forearm—breaks close to the wrist."[1] A "comminuted" fracture occurs when a bone breaks in more than two places or is fragmented.[2] A fracture is "displaced" when "the broken pieces of bone do not line up right."[3]

Specifically, the x-rays showed the fracture was "intraarticular". (703). "An intraarticular fracture is one that extends into the wrist joints." ('Articular' means 'joint')" [4] The post-splint x-ray also showed a "subtly visualized…acute non-displaced fracture through the base of the ulnar styloid process…." The splint was shown to result in "improvement of displacement of the fracture…." (*Id.*). Bowers was referred to a Dr. Davenport in Lawton.

**12-16-20**      Tamra Bowers' husband reports collision to AAA, explaining his wife was driving north on 82nd Street when another vehicle came out of a side street across lanes of traffic. Mrs. Bowers' Chrysler struck the other vehicle, and her right hand became twisted in the steering wheel. Mr. Bowers also told AAA his wife was examined at the hospital; she and he were told she had a broken wrist, and a cast was put on her right arm. (Cl. Note 84-85).

**12-17-20**      AAA auto damage adjuster Warrior spoke to Mr. and Mrs. Bowers about damage to their car. (Cl. Note 82).

---

[1] <u>Distal Radius Fractures (Broken Wrists)</u>, OrthoInfo (Am. Acad. Ortho. Surgs.)
<u>https://orthoinfo.aaos/org/en/diseases-conditions/distal-radius-fractures-brokenwrist</u> (last visited 2/3/24).
[2] Hodges & Hubbard, CLINICAL ANATOMY FOR LAWYERS 163 (Am. Bar. Ass'n. 2012.
[3] <u>Distal Radius Fracture (Broken Wrist)</u>, *supra*.
[4] *Id*.

**12-21-20**    AAA medical payment adjuster Hedrick speaks to the Bowers. They tell Hedrick that Tamra had been to see the doctor to whom she was referred in the emergency department but he would not bill the insurer or the other driver. Mr. Bowers told adjuster their health insurer, Blue Cross, "will deny anything auto related." They were told at the doctor's office surgery on the arm would cost $20,000, and they "did not know how to proceed." The adjuster explained that Bowers' auto policy includes medical payment coverage, which would apply, but the amount is only $1,000. The adjuster did not tell the Bowers anything about the UM coverage in their policy (Cl. Note 81).

**12-24-20**    Attorney Scott Ray of Lawton sends letter of representation of Bowers to AAA, notifying AAA of potential claims under medical payment and uninsured motorist (UM) coverages of the auto policy AAA issued to the Bowers. (461).

**12-27-20**    Collision claim adjuster Warrior reviews police report. (Cl. Note 80).

**1-5-21**    AAA received a Health Insurance Claim Form on behalf of Lawton Emergency Group in the sum of $1899 for services to Bowers on date of accident. (526-27).

**1-27-21**    AAA issues check to Lawton Emergency Group for $1000, representing the entire amount of the medical payment coverage in the Bowers policy, but for some reason, this check was voided. Another check was issued on 2-11-21. (604, 661).

**Bowers_Mort Welch 00013**

**2-2-21**     Megan Frantz, casualty specialist for AAA since 2018, is assigned a potential UM claim and reviews claim notes and police report (271). Frantz calls Ray and speaks with his legal assistant, Kathy Ramsdell, who then emails Frantz with claim number and adjuster name for auto liability insurer of Ford involved in collision. (606). On same date, medical payment adjuster Hedrick spoke to adjuster for liability insurer of other vehicle, who inquired if Rogers had UM coverage since possible no coverage for at-fault driver Armstrong. (Cl. Note 71).

**2-3-21**     Frantz-Ray letter requesting Bowers' medical records and bills, name and address of her employer, and requesting she sign enclosed medical authorization. (526-27).

**2-4-21**     Bowers sees Dr. Steven Arnold for the first time. She also sees him on 3-4-21 and 5-18-21. (Arnold bill, 702).

**2-22-21**     Ramsdell-Frantz email confirming 2-3-21 conversation in which Ramsdell said Ray's office would collect and send Frantz the medical bills and records. (662). Frantz did not thereafter request authorizations be signed or refuse to proceed with claim because Bowers did not sign authorizations.

14

**2-18-21**    AAA pays for repairs to Bowers' Chrysler under collision coverage of Bowers' policy. (171). AAA then makes subrogation claim to insurer of other vehicle involved in collision, which pays the subrogation claim on 5-7-22. (Redpoint Co. Mut. Ins. Co. check, 663).

**3-17-21 through 5-21-21**    Bowers has occupational and physical therapy at Comanche County Memorial Hospital (dates 3-17, 3-19, 3-23, 3-26, 3-30, 4-2, 4-9, 4-13, 4-16, 4-27, 4-29, 5-6, 5-7, 5-21, 14 sessions). Comanche County Memorial Hospital bills. (691-693).

**6-4-21**    Frantz confirms other driver's liability insurance is $30,000. (Cl. Note 57).

**9-3-21**    Ray-Frantz letter transmitting Bowers' medical bills and records, and police report. The bills are as follows:

1. Southwestern Medical Center for Emergency Department exam and x-ray = $4,627.04. (694-96).

2. Lawton Emergency Group LLC—emergency room doctor = $1899. (698).

3. Eagle Partners PLLC—radiologist in Emergency Department = $184. (699).

4. Steven Arnold, P.A.—orthopedic doctor exams = $1087. (702).

5. Comanche County Mem. Hospital—occupational/physical therapy = $7,213.30. (691-693).

   **TOTAL:  $15,010.87**

**Bowers_Mort Welch 00015**

The letter points out, supported by citations to and quotations from several published medical articles, that Bowers is at risk of developing post-traumatic osteoarthritis (PTOA).[5] PTOA is "'most common following injuries that disrupt articular surface or head to joint instability'", with "'[t]he reported rise of PTOA following significant joint trauma is as high as 75%; articular fractures can increase the risk more than 20-fold.'"[6]

Ray refers to medical literature so AAA will understand the nature of his client's injury. "'Posttraumatic osteoarthritis (PTOA) occurs after traumatic injury to the joint. It is most common following injuries that disrupt the articular surface (as happened to Tamra) or lead to joint instability.'" (*Id.*) The letter points out that '[u]nlike idiopathic OA which tends to affect older adults in specific joints..., PTOSA occurs in younger patients, often develops and progresses more quickly, and in accordance with joint injury.'" (*Id.*)[7]

Ray's letter explains that PTOA does not develop right away, but "'[t]he time course over which clinically measurable OA develops is highly variable, ranging from 2 to 5 years in the case of certain articular fractures, to decades for less severe joint injuries.'" (*Id.*)[8]

---

[5] "Arthritis is taken from the Greek term 'disease of the joint: It is defined as an acute or chronic joint inflammation that often co-exists with pain and structural damage.... Osteoarthritis...is non-inflammatory arthritis. In osteoarthritis, the major contributing factors include...joint trauma.... Senthelal, Li, Ardeshirzadeh, Thomas, Arthritis, NCCI Bookshelf Stat Pearls (Nat. Inst. Health June 20, 2023, last update), https://ncbi.nih.gov/books/NBK518992 (last visited 2-3-24).

[6] 687, Ray-Frantz letter, quoting Schenker, Mover, Ahn, Mehta, Pathogenesis and Prevention of Posttraumatic Osteoarthritis After Intra-articular Fracture, J.Am.Acad. Orthop. Surg. Vol. 22(1) (Jan 2014)

[7] The quote is from Krames, Hendricks Wang, Pathogenic Mechanisms of Posttraumatic Osteoarthritis Opportunities for Early Intervention, INT. J. CLIN. EXP. MED. (2011).

[8] Quoting Anderson, Chobinskaya, Guilak, Martin, Oegema, Olson, Buckwalter, Post-Traumatic Osteoarthritis: Improved Understanding and Opportunities for Early Intervention, J. ORTHO. RESEARCH (June 2011).

**Bowers_Mort Welch 00016**

Ray also quotes the medical literature so AAA knows that PTOA from intra-articular fracture causes "'significant functional deficits, pain and stiffness.'" (688).[9]

Ray's letter also discloses that the maximum bodily injury liability coverage for the at-fault driver, Armstrong, is $30,000. (686). The letter concludes that this amount is insufficient to compensate Bowers for the damages she has suffered as a result of the intraarticular radius fracture and demands payment of the maximum amount of UM coverage in the Bowers policy, $100,000.


**9-8-21**    Frantz, now promoted to a casualty specialist, receives Ray's 9-3-21 letter. She submitted the bills to CCC for review. CCC owns Auto Injury Solutions, which subsequently generated a report on the reasonableness of medical bills submitted with Ray's 9-3 letter. (See 861-871). Frantz testified AAA did not reduce the amount of any of the bills in her evaluations based on this report. (Frantz depo. 92-93). Frantz also sends a letter to the healthcare providers whose bills she received from Ray with a form affidavit. (Cl. Note 56, 9-9-21 Frantz letters, 666-684).

The affidavit is to be filled in by the provider with the amount billed, amount paid by insurance or otherwise, whether part of bill "written off" and amount still unpaid. The affidavit refers to 12 O.S. Section 3009.1 as authority for the affidavit. (See 668 for sample affidavit). However, none of the providers signed and returned the affidavits. (Frantz depo. 146, 9-21-21 Cl. Note, 55). Consequently, AAA did not have any evidence that any medical providers had been paid less than their bills and "written off" the rest, as required for the application of the statute cited in the letters.

---

[9] Quoting Anderson, Marsh, Brown, <u>The Pathomechanical Etiology of Post-Traumatic Osteoarthritis Following Intraarticular Fractures</u>, 31 J. IOWA ORTHO 1 (2011).

**Bowers_Mort Welch 00017**

**9-20-21**    Ray-Frantz letter to advise the liability insurer for at-fault driver offered its maximum liability coverage, $30,000, and inquiring if AAA waives potential UM subrogation claim. (885).

**9-27-21**    Frantz conducts first evaluation of UM claim based on bills and records sent by Ray. She did not read any of the medical literature quoted and cited in Ray's 9-3-21 letter (Frantz depo. 133), nor did she ever conduct any research of her own about PTOA resulting from intra-articular fractures. (Frantz depo. 131-133). She evaluates "special damages" as the total amount of bills for services by the medical providers, $15,010.34.[10] She evaluated "general damages" at a range of $20,000-$23,000.[11] The total damages thus equal $35,010.34 to $38,010.34. Since the at-fault driver had $30,000 liability coverage Frantz concluded the UM claim was worth $5,010.34 to $8,010.34 (called by her "new money"). (9-27-21 Cl. Note 54). Frantz obtained the authority of her supervisor, Glut, to make an offer within this range (9-27-21 Glut Cl. Note 55). The evaluation was reduced, Frantz testified, because according to Dr. Arnold, Bowers was "non-compliant" with treatment by removing her cast. (Frantz depo. 170-72, 191). She also discounted value because Bowers quit arm therapy before the scheduled course of visits. (Frantz depo. 191, 234-237).

---

[10] "Special damages" are economic losses, according to AAA's Claims Handling Guide. (1212).
[11] AAA defines "general damages" as "what the law allows for pain and suffering resulting from an injury" and points out that the "manner of measuring pain and suffering depends on the circumstances…." Claims Handling Guide 1195. As discussed, *infra*, this definition is erroneous.

**Bowers_Mort Welch 00018**

**10-1-21**        Frantz letter to Ray confirming 9-30-21 telephone conversation with his assistant in which she offered the low end of her evaluation to settle the UM claim, $5,010.34. (881). On same day, Frantz sends Ray a letter stating AAA waives any potential UM subrogation claim against the at-fault driver. (883).

**12-14-21**        Ray-Frantz letter (891) reviewed by Frantz on 12-16. (Cl. Note 48). In this letter, Ray addresses Frantz's opinion that Bowers' claim should be reduced in value because she was "non-complaint" with a doctor's placement of a cast on her wrist and quit going to therapy. He explains that the cast "caused her anxiety almost like a claustrophobic reaction" which is why she removed it and was given a removable one (one using Velcro).  He supports this assertion (as he did in his 9-3-21 letter) with quotations from medical literature: "'Even latent claustrophobia can affect patients' response to short arm casting, stimulating responses similar to more classically confining environments, and causing responses that may be misinterpreted as non-compliance.'" (892).[12] The answer? "'[R]emovable splints should be applied'" as was done to Bowers' arm. (892-93).[13]

Ray then asked Frantz to provide "actual documentation that removing a cast and replacing it with a removable cast causes any damage or alters a patient's future in any way (other than

---

[12] Quoting Intolerance of Short Cast Wear by Patients with Claustrophobia, 35 J. HAND SURG. Issue 5 (May 2010).
[13] Quoting Management of Intolerance to Casting the Upper Extremities in Claustrophobic Patients, SCIENT. WORLD J. (Oct. 2014).

**Bowers_Mort Welch 00019**

avoiding unnecessary medical expenses).” Frantz neither reviewed the medical literature quoted in Ray's letter nor provided him with any evidence that, by taking off the cast and replacing it with a removable one, Bowers had contributed to her own condition, thereby justifying the evaluation placed on her claim. (Frantz depo. 171-173, 191).

Ray's letter also addresses Bowers' “voluntary” discharge from therapy. He quotes the therapist's records: “She requests discharge due to having difficulty getting here.” (893). He then shows from the same records that Bowers had achieved the short and long-term goals the therapist and Bowers set which show “Tamra met her goals (*2) or exceeded her goals (x8) and only had one goal she did not meet and had in fact gotten worse since her therapy began.” (893). Finally, the letter states Bowers continues her home therapy (“HEP”) as recommended by her therapist. (*Id.*).

Once again, Ray concludes by requesting that Frantz provide “any evidence that Tamra has sustained any damage or altered her future in any way because she met or exceeded all of her OT goals less one and she continues therapy to this day.” (*Id.*). AAA never provided the requested evidence to Ray because it never had any evidence that, by discontinuing therapy when she did, Bowers contributed to her own damages. (Frantz depo, 191, 234-37).

**1-19-22**    Frantz-Ray letter requesting Bowers' recorded statement over a year after claim reported. (903).

**Bowers_Mort Welch 00020**

**3-18-22**      Frantz takes Bowers' statement. Ray records statement because AAA recorder didn't work. (Cl. Notes 40-44, 3-18-22 Ramsdell-Frantz email with audio recording, 905). In her notes, Frantz summarizes the statement, but the actual audio contains more information.  When Bowers went to doctor as directed in ER she was told she needed surgery "right away" but doctor she was referred to would not bill a third party, i.e., the auto liability insurer for at-fault driver.

Bowers became depressed as she could not do any of the farm and garden work she normally did and lost the opportunity to sell her garden produce at the farmers' market. She described restriction and pain in her personal activities, such as dressing, toilet, washing dishes, planting seeds, and cooking, and that she felt like a disappointment to her husband for not being able to handle the farm and housework (which included post hole digging, fence mending, and lifting heavy objects, among other things) while he worked full time.

She continues to have pain; her wrist does not fully rotate. She became claustrophobic and had a panic attack while the hard cast was on. Dr. Arnold (who put on cast) told her it was too late to perform surgery by the time she got to him. When she took the cast off, Arnold replaced it with a removable one, and she no longer felt claustrophobic.

She was forced to use her left, non-dominant hand more.

Continued hand therapy at home as instructed by the therapist and knew from therapy sessions exactly what she needed to do in home therapy.

**Bowers_Mort Welch 00021**

**4-29-22**    Ray-Frantz letter (916) prompted by no further settlement offers since Bowers' statement taken on 3-18-22. Ray points out Bowers told Frantz "she continues to perform the prescribed therapy and still suffers pain" and "[h]er activities of daily living after affected day after day…. Since it is almost 1 ½ years post-crash, it is obvious she will continue to suffer pain and alteration for the rest of her life", 37 years. (*Id.*). Ray reasserted his initial demand for payment of the $100,000 limit of the UM coverage. (917).

**5-2-22**    Frantz conducts a second evaluation of the claim, which increased the Special Damages by $2,000 to account for the loss of income Bowers discussed in her statement, raising total Special Damages to $17,010.34. She increased General Damages slightly by $5,000, so the General Damages range is $23,000 to $26,000. (Frantz depo. 225). The total value assigned is $40,010.34 to $43,010.34, so the UM evaluation is $10,010.34 to $13,010.34 after deducting $30,000 paid by the liability insurer. (8-2-22 Cl. Note 331).[14]

**5-3-22**    Frantz-Ray's letter offers $10,034.10 per her telephone conversation with Ray's assistant on 5-2 (909, see also Cl. Note 33). Ray responded to the offer by letter dated 5-2 (date may be typographical error).   (918). In this letter, Ray requests AAA to answer a series of questions, which Frantz invited Ray to ask in her letter. ("If you have any questions about this claim, please don't hesitate to contact me.") These questions include disclosing the allocation of

---

[14] The Claim Note according to the adjuster incorrectly shows the total or "full value" the same as the initial evaluation in 9-21.

Bowers_Mort Welch 00022

total damages to each element of damage that is potentially recoverable on Bowers' claim against the at-fault driver as outlined in the standard jury instruction on damages for bodily injury in tort cases.

**5-9-22**    Ray-Frantz letter requesting certified copy of Bowers' auto policy. (922).

**5-13-22**    11 days after Frantz received Ray's 5-3 letter, she calls Ray's assistant to advise AAA now wants Bowers to be examined by a doctor of its choice. (Cl. Note 32). The decision to get the exam was her supervisor's. (Frantz depo. 234).

**5-19-22**    Frantz makes request to ExamWorks for a doctor to examine Bowers. (Cl. Note 31). She also sends a letter to Ray (985) that does not answer most of the questions in his 5-3-22 letter. Specifically, she failed to provide a breakdown of her damages evaluation among each recoverable element of damage. And at no time after that did Frantz ever respond to the allocation question or explain why she had discounted Bowers' damages for being "non-compliant" with the cast and discharging herself from arm therapy or whether AAA disputed Bowers was at risk of developing PTOA in the future due to the intra-articular fracture of her right radius. (See Frantz depo. 234-237).

**Bowers_Mort Welch 00023**

**5-25-22**    Frantz sends Bowers policy to Ray. (889).

**6-24-22**    Ray-Frantz letter pointing out that AAA failed to answer the questions posed in his 5-3 letter--and that his office has not been advised of the arrangement for a medical examination of Bowers. (1066).

**7-19-22**    ExamWorks-Ray letter advising of scheduled exam of Bowers by Dr. Steven Brantley on 8-26-22. (1079).

**8-26-22**    Tamra Bowers is examined by Dr. Steven Brantley at AAA's request. (8-29-22 ExamWorks-Frantz letter, 1084).

**9-12-22**    Ray-Frantz letter again requesting answers to the questions posed in his previous letters or pay the UM coverage limit by 9-22. (1088).

**9-15-22**    Frantz-Ray letter advising report of 8-26 exam not yet completed. (1105).

**9-16-22**    ExamWorks emails undated report of Dr. Brantley to Frantz. (1107).

**Bowers_Mort Welch 00024**

The report dated 3-18-22 (1109-10) includes information provided by Bowers in the History section—facts of accident, E.D. exam, inability to see surgeon, subsequent non-surgical care, "severe anxiety and claustrophobia" when cast on, "continues to have daily pain with the wrist…She has limited motion and strength of the wrist since the injury."

The report describes the doctor's findings on physical examination. These include "mild global tenderness…over the dorsum of the distal radius", some limitation of motion in extension, flexion, and supination, and "minus 5 out of 5 grip strength." The doctor had an x-ray of radius taken. It showed "mildly malunited intra-articular distal radius fracture with mild depression of the articular surface." (1110).

The remainder of the report addresses questions posed by AAA. In response to question 1 (which *appears* to be whether Bowers has permanent disability, as question is not restated in the report), the doctor opines: "The patient does have some partial disability secondary to her injury and resultant malunion"; "[s]he does have some motion of the wrist and has some decreased strength"; "she may try to do activities although with the decrease in range of motion and strength this most likely will give her issues going forward."

Apparently, the doctor was asked how Bowers would be in the future because he refers to his "prognosis": "[S]he is at max medical improvement from her injury, and she should need no further treatment." The doctor does not address whether Bowers will likely need to take any medication for her pain, presumably because he was not asked this question.

In response to an apparent question about whether Bowers is at risk for developing PTOA, he states: "this is secondary more to this fracture healing in a slightly malunited position…. With this

**Bowers_Mort Welch 00025**

being in a slightly malunited position she is at increased risk for posttraumatic osteoarthritis although we do not see evidence of this at this time on her x-rays."

Included within the answer to the third question is also the answer to an apparent question on the impact of taking the cast off and not completing all of the prescribed therapy: "This has nothing to do with the patient's noncompliance with fracture treatment or not finishing her physical therapy. The fracture would have healed in a malunited position since it did not undergo surgical correction."

**9-20-22**    Frantz conducted her third evaluation of the claim after receipt of Dr. Brantley's report. The upshot of the report (which in all respects is consistent with the medical literature quoted by Ray to Frantz and Bowers' statement) appears to have caused an increase in the General Damages range from $23,000 to $26,000, to $38,000 to $46,000--a $15,000 to $20,000 increase over the second evaluation conducted after Bowers' statement was taken. This resulted in a total value of $55,000.34 to $63,010.34, and a UM payment range of $25,010.34 to $33,010.34. (Cl. Note 24-25).

**9-21-22**    Frantz-Ray letter with Dr. Brantley's report and confirming that in conversation on the same date, she offered $25,010.34, the low end of her evaluation range, and a $15,000 increase over the previous offer. (1122).

Bowers_Mort Welch 00026

**10-11-22**  Ray-Frantz letter (1132). In this letter, Ray provides statistics on the cost of pain medication to alleviate the pain AAA does not deny his client suffers and which its chosen doctor says is the result of her injury, not to mention the additional expense to alleviate the symptoms of PTOA which Ray early on informed AAA about, including specific references to medical literature. He also requests AAA to state whether the dollar amount of the total $25,000 in General Damages, which Frantz included in her last evaluation, was for the various recoverable elements of non-economic damages Bowers would be entitled to recover from the at-fault driver, as well as future medical (medication) expense.

**10-28-22**  Frantz-Ray letter increasing offer by $2500 to $27,500. (1149, see also 10-28-22 Cl. Note 18). This is still more than $ 5,000 less than the top end of her current evaluation. The claim file does not show Frantz conducted another evaluation before making this offer. In response to the allocation requests posed in Ray's 10-11 letter, Frantz states all elements of damage in the standard jury instruction were considered but did not disclose any amounts assigned to any specific element of general damages.

**11-21-22**  Ray-Frantz letter pointing out that although Frantz said she "considered all of the elements under OUJI 4.1", the tort damage in bodily injury case damage instruction, "you did not state CSAA's decision on these elements." (1153). Ray again requests AAA identify the sum assigned to each element of damages in its evaluation.

**Bowers_Mort Welch 00027**

**12-6-22**    Frantz-Ray letter (1161) in which AAA refuses Ray's repeated request that the allocation of total damages assigned to each recoverable element of General Damages be disclosed. The basis for this refusal? Since a jury does not allocate an award of damages in its verdict, AAA does not have to disclose its allocation when evaluating a UM claim: "We believe this to be an overly broad request and is greater than what is required or expected of an Oklahoma jury. We believe in looking at these jury instructions, consideration must also be given to introduction language as well which indicates the following elements may be considered but not required to be considered if not applicable. At the time the jury renders their verdict, they are not required or expected to break down the individual elements, they are just required to provide a value for general damages which is what we have done in Ms. Bower's [sic] case." The claim file contains no reference to this analysis of why AAA did not have to disclose the allocation of elements of recoverable damages in its evaluations.

**12-19-22**    Frantz-Ray telephone conversation in which Frantz told Ray that by increasing her offers "I have attempted to negotiate against myself." (Cl. Note 16). On the same date, Ray sent Frantz a letter stating his client would accept $90,000 ($10,000 less than the UM limit) against his recommendation. (Cl. Note 15, 1-5-23 Frantz-Ray letter 1167).

**1-5-23**    Frantz-Ray letter increasing offer another $2500 from $27,500 to $30,000. (1167, see Cl. Note 15). The claim file does not show another evaluation of the claim was made before Frantz increased AAA's offer.

Bowers_Mort Welch 00028

The remainder of the unredacted claim file does not contain any response to the $30,000 offer or any further offers by AAA.

Bowers_Mort Welch 00029

**VIII**.  **The Bowers Policy.**

Part III of the Bowers Policy is entitled **Uninsured/Underinsured Motorist Coverage**. As required by the UM statute, 36 O.S. § 3636(B), the Insuring Agreement states: "… **we** will pay for damages, other than punitive or exemplary damages, that an **insured person** is legally entitled to recover from the **owner** or **operator** of an **uninsured motor vehicle** because of **bodily inury:** 1. sustained by an **insured person**; 2. caused by an **accident**; and 3. arising out of the ownership, maintenance or use of an **uninsured motor vehicle**." (01013).

**Uninsured motor vehicle** is defined in pertinent part as "a land motor **vehicle** or **trailer** of any type:...**d.** to which a **bodily injury** bond or policy applies at the time of the **accident**, but the sum of all applicable limits of liability for **bodily injury** is  less than the **insured person's** damages." (See **PART III, ADDITIONAL DEFINITIONS, ¶2**, 1014).

 "**Insured person"** is defined in pertinent part as: "**a**. **you** …." (GENERAL DEFINITIONS 1., 999).  Bowers, as one of the people in whose name the policy was issued, is a **you** and thus an **insured person** in the UM coverage. **Bodily injury** is defined as "bodily harm, sickness, or disease, including death resulting therefrom." (*Id.* at ¶4, 1000). **Accident** is defined as "sudden, unexpected and unintended occurrence." (*Id.* at ¶1, 1000).

My review of the claim file indicates AAA conceded: Bowers is an **insured person**; she sustained **bodily injury** caused by an **accident** arising out of the use of an **uninsured motor vehicle**; and she is legally entitled to recover damages from the **operator** of the **uninsured motor vehicle**.

**Bowers_Mort Welch 00030**

## IX. National Standards for Adjustment of Insurance Claims.

National standards exist that are generally applicable in the insurance claims adjustment industry, regardless of the type of policy under which a claim is made and regardless of the status of the person making the claim, i.e., whether a person is a first party or a third party claimant. Standards also exist more specifically applicable to first and third party bodily injury claims including UM claims under motor vehicle policies.[15]  These standards are identified in claims handling insurance literature, model legislation prepared by the National Association of Insurance Commissioners (NAIC), case law that incorporates specific insurance industry standards, standards incorporated by insurers into their own training material, and standards that are known to me from my experience over 45 years as described in Section II, *supra.*

National standards serve an important goal of establishing consensus understanding of what good claims handling practices are.[16]  The identification and publication of consensus standards serves to protect both first and third party claimants from "unscrupulous, unethical or poorly trained adjusters who are looking for ways to deny a claim, as opposed to simply conducting the

---

[15] Bowers is a first party claimant because she made a claim directly for payment of benefits under the UM coverage of the auto policy.

[16] *See e.g.,* Douglas Howser, *The Unfair Claims Settlement Practices Act*, 15 THE FORUM 336 (1979), and James K. Markham et al. *The Claims Environment* at 297 (Ins. Inst. Of Am. 1993) (hereinafter referred to as *Claims Environment*).

**Bowers_Mort Welch 00031**

evaluation" of the claim.[17]  The NAIC developed model legislation which has as its purpose "to set forth standards for the investigation of claims arising under policies and certificates."[18]


## A.  Investigation Standards.

The insurance industry and its regulators recognize that the investigation of any insurance claim must be thorough, timely, fair, and balanced, taking into account not only the insurer's interest in making a profit from the sale of insurance but also the interest of the insured/claimant to be compensated for a loss under a policy for which he/she (or a third party) has paid a premium. To accommodate these interests, insurance companies must give at least equal consideration to the interests of the insureds/claimants as they do to their own interests.[19]  An insurer cannot give equal consideration to the interest of an insured/claimant if it treats the insured/claimant as an adversary. As one industry publication put it, "[t]he adjustment process is not a contest in which either the company or the insured win and the other loses.  This type of attitude creates an adversarial relationship from the beginning which is hard to overcome."[20]  An insurer may not treat its own insured in the manner in which it may treat a third party claimant making a claim against the

---

[17] Michael T. Murdock, *Claims Operations – A Practical Guide* (Int'l Risk Mgmt. Instit., Inc. 2010) at 129 (herein referred to as *Claims Operations*).

[18] *Model Unfair Claims Settlement Practices Act* §§ 1 & 3 (NAIC 1990) (Model Act).

[19] *See e.g.*, the Introduction to *Claims Handling Principles & Practices* (Am. Instit. For Charter Prop. Cas. Underw. 2006) §§ 2.37 & 5.3 (hereinafter *Claims Handling P&P*); *Claims Operations, supra,* at 415. Oklahoma law follows this standard.  *See e.g.,* <u>Magnum Foods, Inc. v. Continental Cas. Co.</u>, 36 F.3d 1491, 1504 (10th Cir. 1994) ("[w]hile the insurance company may properly give consideration to its own interest, *it must in good faith, give at least equal consideration to the interests of the insured....*") quoting from <u>American Fid. & Cas. Co. v. G.A. Nichols Co.</u>, 173 F.2d 830, 832 (10th Cir. 1949) (applying Okla. law – emp. by ct.).

[20] *The Claims Environment, supra,* at 299.

Bowers_Mort Welch 00032

insured.[21]  Moreover, "good faith investigation requires collection and consideration of facts that are favorable to the position claimed by the insured as well as the position that favors the interest of the insured [sic]."[22] For example, a UM insurer may not actively seek to defeat its insured's suit against the alleged uninsured motorist.[23]  These basic principles should be adhered to in the most important part of the processing of a claim, its investigation.

Insurance industry training materials illustrate just how important the investigation of the claim is:

> Claims investigations are critical and represent the foundation of the evaluation and assessment of a claim.  The key to a proper evaluation is to review all of the investigation and documentation material and then summarize the key elements of the claim in terms of liability and damages.  The claim investigation serves as the basis for the coverage analysis and evaluation of the claim.  **If the investigation is inadequate or incomplete, then the evaluation may be flawed or incorrect**.[24]

As this quotation makes clear, the industry recognizes that an adequate and timely claim investigation is intrinsic to an insurer's duty to timely pay a valid claim.[25]  The NAIC's Model Act

---

[21] This standard is specifically recognized by the Oklahoma Supreme Court: "An insurer may not treat its own insured in the manner in which an insurer may treat third-party claimants to whom no duty of good faith and fair dealing is owed."  Newport v. USAA, 11 P.3d 190, 196 (Okla. 2000), *reaffirmed in* Badillo v. Mid-Century Ins. Co., 121, P.3d 1080, 1093 (Okla. 2005) : and Hensley v. State Farm Fire & Cas. Co., 398 P.3d 11, 19 n.22 (Okla. 2017).

[22] Barry Zalma, 2 *Insurance Claims: A Comprehensive Guide* at 861 (1st ed. 2015) (hereinafter *Ins. Claims*).

[23] Brown v. Patel, 157 P.3d at 130 (Okla. 2007).

[24] *Claims Operations, supra,* at 115 (emp. add.).  See also p. 155 and NAIC 900-1, Model Act § 4.F (claim denials should not be made "without conducting a reasonable investigation").  This standard has been incorporated into Oklahoma law: "[t]o determine the validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances."  Buzzard v. Farmers Ins. Co. Inc., , 824 P.2d 1105, 1109 (Okla. 1991).

[25] *See e.g., Claims Handling P&P, supra,* § 525 and *Claims Operations, supra,* at 109-110.

33

**Bowers_Mort Welch 00033**

also encourages insurance companies to "adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies".[26]   In my experience many insurers do adopt such standards.  If a claim is not paid or denied and an insured sues the insurer for payment, the insurer has a continuing duty to investigate and evaluate a first party claim.[27]

Of course, an investigation must be tailored to the nature of the claim.  The kind of information necessary to evaluate a claim for damage to insured property is not the same as the information necessary to investigate a bodily injury claim under UM coverage. The investigation may involve the interpretation of policy language, liability under the coverage, or of the benefits that are payable under the coverage.  Because UM coverage in Oklahoma is mandated by statute unless rejected in writing, the investigation of a UM claim requires knowledge of the statute, 36 O.S. § 3636, and court decisions interpreting the statute.  Nevertheless, certain principles of investigation generally apply regardless of the type of claim.

As a matter of standard practice, insurers identify claims for which additional assistance is needed from experts to address issues which have arisen in the course of investigation or evaluation

---

[26] Model Act § 4C.

[27] *See e.g.,* Fullbright v. State Farm Mut. Auto. Ins. Co., 2010 WL 274217 at *3 (W.D. Okla. Jan. 15, 2010) (having authorized the deposition of an insurer's corporate representative on the UM claim after the insured sued the insurer for bad faith delay in payment of the claim, the court concluded that "Plaintiffs may conduct discovery regarding processing and investigation of their claim by the adjuster or adjusters who replaced [the initial adjuster]" after suit was filed; Morgan v. Valley Ins. Co., 2009 WL 3755076 at *3 (W.D. Okla. Nov. 5, 2009) ("activities of Defendant in the nature of the continuation of claim evaluation, processing, and payment or non-payment post-litigation will be generally deemed admissible"); Butterfly-Biles v. State Farm Life Ins. Co., 2010 WL 346838 at *3 (N.D. Okla. July 17, 2014); and Morrison v. Chartis Prop. Cas. Co., 2014 WL 840592 at *2 (N.D. Okla. March 4, 2014).

Bowers_Mort Welch 00034

of the particular claim.[28]  For example, where interpretation of a policy is an issue, "before major claim decisions are made, claims representatives will want legal opinions on coverage…."[29]  For UM claims in Oklahoma, insurers recognize that the courts have produced an extensive body of case law that addresses a multitude of issues that arise in processing UM claims.  Advice of counsel may be needed to determine if case law exists addressing a particular issue that has arisen in the course of processing a UM claim.  I am aware that the failure to obtain good advice from competent Oklahoma counsel about UM claims has cost insurers millions of dollars.

Analysis of projected loss of earning capacity may require hiring consultant economists or vocational experts.  For claims in which liability is at issue, it may be advisable to hire an accident reconstructionist.  For third party and first party bodily injury claims, medical consultants may be needed to assess the nature of the claimant's condition, the cause of the condition, appropriate treatment past and future, and estimated cost of future treatment.  Sometimes a review of the claimant's medical records is sufficient.  On other occasions the consultant may be requested to conduct an examination of the claimant.

Experts of course should be qualified to address the issue in question and should be truly "independent".[30]  Like reliance on other deficient aspects of investigation, reliance on the opinions of unqualified, uninformed or biased professionals creates a risk that the ultimate decision

---

[28] See e.g., *Managing Bodily Injury Claims* (Am. Instit. For Charter Prop. Cas. Underw./Ins. Instit. Of Am. 2d ed. 2001) at 2-14; *The Claims Environment, supra.,* at 20-22.
[29] *The Claims Environment, supra.,* at 21.
[30] 2 *Ins. Claims, supra.,* at 1185-86.

**Bowers_Mort Welch 00035**

regarding a particular claim will be incorrect, and clearly is not consistent with industry standards applicable to the investigation of claims.[31]

Proper claims investigation may also require a claims representative to identify potential human sources of factual information necessary to properly evaluate a claim, including the person making the claim.  For example, if a question exists concerning whether an alleged uninsured motorist was at fault in causing an accident, it may be advisable to interview the alleged uninsured motorist, any witnesses to the accident, and the investigating officer.  The uninsured motorist also can identify any applicable auto liability insurance.  The injured insured should also be interviewed about his injuries, medical treatment, damages, and prior medical and claims history, among other things. Interviewing these sources, including the claimant, can provide significant information about liability and damages.[32]  Thus, statements are a necessary component of the investigation process in many circumstances.

Recording of a statement, or even the taking of contemporary notes of what it said in the statement, can head off future disputes concerning exactly what was said during the course of the recording.[33]  Moreover, by scheduling an interview with the claimant/insured, an adjuster can also

---

[31] <u>Barnes v. Okla. Farm Bur. Mut. Ins. Co.</u>, 11 P.3d 162, 171-174 (Okla. 2000) illustrates the potential consequence of an insurer's reliance on a lawyer's unreasonable interpretation of the UM statute.
[32] See e.g., *The Claims Environment, supra.,* at 46 ("The basic purpose of a statement is to gather information in a logical and orderly fashion so that claims representatives can make decisions necessary for the disposition of claims.").
[33] *See e.g.*, *The Claims Environment, supra.,* at 46.

**Bowers_Mort Welch 00036**

take the opportunity to explain what the particular policy requires to establish a covered claim and assist the claimant/insured if needed in getting such information.[34]

In my experience, claims based on bodily injury require access to health care provider bills and records and may require asking questions of providers who treated the claimant, such as to clarify statements in the records or to address issues not identified in the records. Because bodily injury claims usually involve some intangible damages, such as physical and mental pain and suffering, in my experience it is important to look for descriptions of pain in medical and hospital records and to interview the claimant to assess how he/she articulates pain and suffering, whether it may have causes unrelated to the incident involved in the claim, and how the pain affects the claimant's activities, relationships, and state of mind. If the claimant asserts a loss of earnings as an element of damage it may be necessary to obtain employment records directly from current and previous employers.

Insurers have access to databases showing previous insurance claims by the claimant. Depending on the nature of the previous claim, it may be appropriate to seek further information about a particular previous claim. Similarly, if the claimant received treatment for a condition he/she currently asserts was caused by the accident which is the subject of the current claim, it may be appropriate to obtain records of the prior treatment and to interview the claimant about the prior treatment.

---

[34] See e.g., 1 *Ins. Claims, supra.,* at 384-385.

**Bowers_Mort Welch 00037**

UM claims are unique to the extent the adjuster must know whether the allegedly at-fault driver was insured and, if so, what is the applicable limit of liability, i.e. maximum amount of liability insurance. Sometimes, this information can be obtained from the potential uninsured motorist's liability insurer. Proof of the at-fault driver's auto liability insurance can be provided by the insured's lawyer.

Most policies contain provisions that allow the insurer to obtain information in the course of an investigation of a claim. For example, the Bowers' policy states that "A person claiming coverage under this policy must:

     1. cooperate with **us** in the investigation, settlement or defense of any claim or lawsuit;

                   \*                  \*                 \*

     3. allow **us** to take signed or recorded statements, including sworn statements and examinations under oath…and answer all reasonable questions **we** may ask as often as **we** may reasonably require;

                   \*                  \*                 \*

     8. submit as often as reasonably required, to physical exams at **our** expense by physicians **we** select;

     9. authorize **us** to obtain medical, employment and other pertinent records, and allow us to discuss, when appropriate, the injury or impairment with any medical provider of employer.

**YOUR DUTIES IN CASE OF AN ACCIDENT OR LOSS—OTHER DUTIES**. (999).

As the quoted policy language states, an insured is required to cooperate in the processing of his claims. An insured also has a common law duty to cooperate with the insurer handling his

38

claim.[35]  However, if the insurer can obtain information from sources other than the insured, a first party claim should not be denied and closed for lack of cooperation.[36]  "The insurance adjuster knows better than an insured what is needed to prove a claim."[37]  Since the insurer is the contracting party, which is obligated to pay covered claims, it also has the responsibility to investigate a claim made under a policy. The insurer should not, therefore, try to shift that responsibility to the claimant/insured, particularly when the insurer already has the means to obtain information about the claim.[38] This is not to say the insurer cannot request the claimant, including a claimant represented by counsel, to provide pertinent information.  The insurer always has the right to insist the claimant and his/her representative reasonably cooperate in the investigation. Any lack of such cooperation should be documented in the claim file, and the claimant informed of any policy provision requiring cooperation.  However, if the requested information is not provided to the insurer, the claims representative must seek out other sources of pertinent information.  If the information cannot be obtained from third party sources, the insurer should inform the claimant that the investigation cannot be completed due to the claimant's failure to cooperate.

---

[35] *See,* First Bank of Turley v. Fidelity & Dep. Ins. Co. of Md., 928 P.2d 298, 304 (Okla. 1996). .
[36] *See,e.g*., 2 *Ins. Claims, supra.,* at 867-868.
[37] 2 *Ins. Claims, supra,* at 863.
[38] *See, e.g.,* Christie v. State Farm Mut. Auto. Ins. Co., 2015 WL 475586 at 8 (E.D. Okla. Aug. 11, 2015) (condemning repeated requests by insured to UM insured's lawyer to provide medical reports since insurer previously furnished with signed medical authorization.)

39

Bowers_Mort Welch 00039

**B. Documentation Standard.**

Proper claims handling requires adequate documentation.[39]  This is because "[t]he claim file is the basic foundation on which all claims are resolved."[40]  Significant actions taken on a claim should be documented and should include a description of communications with other persons, the actions taken by claim representatives, and other documents pertaining to a claim, including dates and identification of persons participating in material events both for the insurer and third parties.[41]  The file should include any letters or other modes of communication between the claim representative and other persons, including the claimant or his/her legal representative.  All documents obtained from outside sources, as well as those generated by claim representatives, should be in the claim file.  Photos, videos and audible recordings should be in the file.

"The claim file should [also] reflect the thought processes that were followed in the investigation of the claim.  Whatever process was used to arrive at the conclusions or opinions concerning coverage or payment should be included in the file".[42]  This aspect of the standard is particularly important.  For example, because of an insurer's duty to timely make an offer (or denial) of payment after investigation of a UM claim, it is very important that the claim file show how the adjuster arrived at the dollar amount for each element of recoverable damages, and why

---

[39] *See, e.g.*, *Claims Operations, supra,* at 123-124.

[40] 1 *Ins. Claims, supra,* at 656.

[41] *See e.g.,* Steven Plitt, *The Claim Adjuster's Automobile Liability Handbook* § 6.16.A(1); 1 *Ins. Claims, supra.,* at 590-92 & 659-660.

[42] 1 *Ins. Claims, supra,* at 662-63.

40

**Bowers_Mort Welch 00040**

some elements of damage may not have been included in the calculations used to arrive at a total sum of damages.

"[A]ll claim activities documented in the claim file notes need to be clear so that any person reviewing the claim file will know the status of the investigation and the adjustment of the claim".[43] In my experience, insurer internal claims management policies require claims supervisors to periodically review claim files for a variety of reasons. The law in many states likewise requires insurance regulators to audit claim files. [44] Therefore, proper documentation "can serve as excellent evidence that [an adjuster] handled a claim with dispatch, providing timely and continual communication", and will provide evidence of good faith claims handling and competency of the claim representative.[45] Ultimately, the purpose of adequate documentation is, as the NAIC has stated, to provide "[d]etailed documentation… in each claim file in order to permit reconstruction of the insurer's activities relative to each claim."[46]

---

[43] *Claims Operations, supra,* at 123.
[44] *See, e.g.,* 36 O.S. § 1250.4(A): OKLA. ADMIN. CODE § 365:15-3-3(a); 1 *Ins. Claims, supra,* at 656.
[45] Willis Park Rokes, *Aggressive Good Faith and Successful Claims Handling* at 115 (Ins. Instit. of Am. 1987).
[46] Unfair Property/Settlement Claims Settlement Practices Model Regulation § 4.B (NAIC 902-1); and 36 O.S. § 1250.7(A)(C).

Bowers_Mort Welch 00041

### C. Communication Standard.

Prompt and clear communication by the insurer with the claimant/insured, his/her representatives, and relevant third parties is a national standard of claims handling, during both the investigation phase of a claim and at the point when a decision on a claim is made.[47]  During the adjustment process, an insurer should keep the insured in a third-party claim and the claimant on a first-party claim informed of the progressive status of the claim and explain the claim adjustment process, including what is expected of the insured/claimant. The Model Act, as well as statutes and regulations in almost every state, require insurers to communicate claim decisions within a certain limit to first-party claimants or to advise the claimant that more time is needed to complete the investigation of the claim.[48]  Communication of a claim denial must explain why the insurer made its decision whether to deny a claim or to pay less than the claimant seeks.  For example, "[a]ll coverage declinations should… [e]xplain why and how… policy language works to exclude coverage in the subject claim."[49] They also should provide "a reasonable and accurate explanation for" both claim denials and offers of compromise.[50]

---

[47] *See e.g.,* MODEL ACT § 6.D (insurer to provide necessary forms, instructions and reasonable assistance to permit the claimant/insured to comply with his obligations in the claims handling process).

[48] See Steven Plitt, *Supplementing the NAIC's Model Unfair Claims Settlement Practices Act: Accompanying State Regulations § B(2)*, 27 CAL. INS. LAW & REG. RPTR. No. 2 (March 2015).

[49] Bill Wilson, WHEN WORLDS COLLIDE: *Resolving Insurance Coverage & Claims Disputes* at 284 (2018).

[50] Model Act § 7.L.

Bowers_Mort Welch 00042

**D.  Insurer's Knowledge of Applicable Law.**

It is a standard in the insurance claims industry that insurers have knowledge of the law applicable to claims handling, interpretation of policies, and of any state laws which apply to the particular type of claim being investigated, and communicate this information to its claims personnel.[51]    An insurance claims training publication summarizes the standard: "[c]laims professionals should have expert knowledge of insurance policy coverages, the law and determination of damages."[52]  This is because "[i]nsurance claims handling not only involves the proper investigation, evaluation and settlement of claims, but also, and frequently on a daily basis, the interpretation and application of policy provisions."[53]    This industry standard has, in Oklahoma, been followed by the law[54].

---

[51] *See, e.g.,* Charles Miller, *The Scope of Expert Testimony in Insurance Bad Faith Cases*, 15 CONN. INS. LAW JRL. 2011, 2017.

[52] *The Claims Environment, supra,* at 12-14.

[53] *The Scope of Expert Testimony in Insurance Bad Faith Cases, supra.*.

[54] *See, e.g.,* Timmons v. Royal Globe Ins. Co., 653 P.2d 907, 913-14 (Okla. 1982) ("The insurance company's decision not to defend plaintiff was made on a determination that coverage did not extend to this accident, and was presumably made in the face and knowledge of applicable Oklahoma law.  The reasonableness of that decision must be judged in light of the applicable law); Willis v. Prudential Ins. Co. of Am., 50 F.3d 793, 799-800 (10th Cir. 1995) (same statement of principle as quoted from Timmons); Brown v. Patel, 157 P.3d 117, 122 (Okla. 2007 ("bad-faith actions have been based upon an insurers' failure to follow judicial construction of insurance contracts or available applicable law"); Barnes v. Oklahoma Farm Bur. Ins. Co., 11 P.3d at 171 (Okla. 2000) (insurer did not follow "the law readily available to insurer and its counsel" in its application of the Oklahoma UM statute); Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 800 (10th Cir. 1995) (insurer deemed to know that when policy language subject to more than one reasonable interpretation, policy is ambiguous, and ambiguous policy language is to be construed in favor of the insured); Crews v. Shelter Gen. Ins. Co., 393 Fed.Supp.2d 1170, 1178 (W.D. Okla. 2005) (insurer is "charged with knowledge that under Oklahoma law insurer cannot void an insurance policy on the basis of an alleged misrepresentation unless the misrepresentation was made with intent to deceive"); Tomlinson v. Combined Underw. Life Ins. Co., 708 F.Supp.2d 1284, 1295-96 (N.D. Okla. 2010) (claim representatives' lack of understanding of "cancer and dread disease" policy precluded dismissal of bad faith claim); and Magellan v. Zurich Am. Ins. Co., 2017 WL 4012964 at *9 n.9 (N.D. Okla. Sept. 12, 2017) (proof that

43

Bowers_Mort Welch 00043

I am evaluating AAA's handling of Bowers' UM claim. Therefore, the specific laws about which the adjusters who handle the claims should have knowledge include the terms of the UM statute, 36 O.S. § 3636, Insurance Commissioner regulations pertaining to UM coverage, and case law interpreting the statute. UM coverage in Oklahoma is mandatory pursuant to section 3636(A) unless rejected in writing pursuant to 3636(G). The required coverage is described in section 3636(A) and (B):

A. No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be issued, delivered, renewed, or extended in this state with respect to a motor vehicle registered or principally garaged in this state unless the policy includes the coverage described in subsection B of this section.

B. The policy referred to in subsection A of this section shall provide coverage therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom….

An "uninsured motor vehicle" is defined in section 3636(C):

C. For the purposes of this coverage the term "uninsured motor vehicle" shall include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency. For the purposes of this coverage the term "uninsured motor vehicle" shall also include an insured motor vehicle, the liability limits of which are less than the amount of the claim of the person or persons making such claim, regardless of the amount of coverage of either of the parties in relation to each other.

---

"insurer acted in a manner that breached the obligation of good faith and fair dealing… can be shown by 'an insurer's failure to follow judicial construction of contracts or available applicable law…."), quoting from Brown v. Patel, *supra*.).

**Bowers_Mort Welch 00044**

By virtue of 36 O.S. § 3636 (A), B), and (C), UM coverage is mandatory in a compulsory auto liability policy unless the named insured rejects the coverages.[55] As a statutorily specified coverage, UM coverage "'must be liberally constructed in favor of the objective to be accomplished.'"[56] That objective "is to' assure each [UM insured] person the full contractual coverage' for which a premium has been paid."[57]

Because UM coverage is statutorily required absent an affirmative rejection "[a]ny language inserted by the insurer in the policy which purports to dilute the legislatively mandated uninsured motorist coverage is void and unenforceable as it violated the public policy espoused in § 3636."[58] The public policy furthered by the UM statute is to afford compensation for damages an insured is entitled to recover from an at-fault driver of a vehicle that is either totally uninsured or insufficiently insured to compensate the UM insured fully for the consequences of bodily injury caused by such fault.[59] While the UM statute includes both totally uninsured and underinsured vehicles within the definition of "uninsured motor vehicle", in practice insurers, lawyers and courts refer to claims based on the fault of operators of totally uninsured vehicles as UM claims and claims based on the fault of operators of vehicles with insufficient liability insurance to compensate the UM insured as UIM claims.

---

[55] *See, e.g.,* Lane v. Progressive No. Ins. Co., 494 P.3d 345, 349 (Okla 2021).
[56] *Id.* at 350, quoting from May v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa., 918 P.2d 43, 48 (Okla. 1996).
[57] Burch v. Allstate Ins. Co., 977 P.2d 1057, 1064 (Okla. 1998), quoting Bohannon v. Allstate Ins. Co., 820 P.2d 787, 792 (Okla. 1991).
[58] State Farm Mut. Auto. Ins. Co. v. Greer, 777 P.2d 941, 943 (Okla. 1981).
[59] *See, e.g.,* Gates v. Eller, 22 P.3d 1215, 1218 (Okla. 2001).

Bowers_Mort Welch 00045

While a statute mandates UM coverage, the coverage itself is contained in an auto insurance policy—a contract. This is a critical fact of UM claim analysis. "Uninsured motorist coverage is a carrier's direct promise to pay the insured for a loss….The recovery of the insured is based on the terms of the policy, and the action is one in contract."[60]  As a contract, an auto policy with UM coverage is subject to the same principles of interpretation as other contracts.[61] Form insurance policies are contracts of adhesion.[62]  "'As such, they are interpreted most strongly against the party that prepares the contract.'"[63] Recently, the Oklahoma Supreme Court cautioned insurers: "[we] will not permit an insurer to inappropriately leverage its uneven bargaining power to contract in such a manner that misleads or deceives the policyholder about what he or she is actually buying."[64]

The contractual nature of a UM claim is in stark contrast to the UM insured's claim against a driver whose fault caused bodily injury to the insured. The UM insurer is involved simply as a party to a contract, not as the alter ego of the tortfeasor."[65] And because the UM carrier is not the alter ego of the allegedly at-fault driver, "[t]he elements in an uninsured motorist action are separate, distinct, and different from those in a case in tort against the tortfeasor…. The actions of the tortfeasor are relevant only to establish that the insured is 'legally entitled to recover' from an

---

[60] Kratz v. Kratz, 905 P.2d 753, 755 (Okla. 1995), superseded on other grounds by amendment to the hospital lien statute, 42 O.S. § 43.
[61] See, e.g., Kerr-McGee Corp. v. Admiral Ins. Co., 905 P.2d 760, 763 (Okla. 1995)
[62] See, e.g., Lane v. Progressive, supra, 494 P.3d at 352.
[63] Id., quoting from Porter v. Ok. Farm Bur. Mut. Ins. Co.
[64] Id. at 352.
[65] Bill Hodges Truck, Inc. v. Humphrey, 704 P.2d 94, 95 (Okla. Civ. App. 1984) (approved for pub. by Sup. Ct.) Because of the Supreme Court authorized publication, this Court of Civil Appeals opinion is deemed precedential. 20 O.S § 30.5.

Bowers_Mort Welch 00046

uninsured motorist, a condition of the insurer's promise to pay 'damages.'"[66] [T]he condition of recovery can be satisfied even if the insured does not prove all the elements of a viable tort claim against the uninsured motorist."[67]

The Oklahoma Supreme Court has also relied upon the contractual nature of a UM claim in rejecting two arguments that insurers in Oklahoma have made for years. The first such argument rejected is that the UM insured must first obtain payment from the automobile fault party exhausting the latter's liability coverage, before he is entitled to payment from his UM coverage. Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1112 (Okla. 1991) (neither the UM statute nor the UM coverage required exhaustion of the liability coverage as a condition precedent to a UM claim).

Subsequently, in Burch v. Allstate Ins. Co., 977 P.2d 1057 (Okla. 1998), the Court held that if the UM insured's damages exceed the applicable auto liability coverage of the at-fault party, the UM insurer "is obligated to pay the entire loss of its injured insured from the first dollar up to the policy limits. This is because UM coverage is primary coverage which applies regardless of any other coverage." *Id.* at1065.

---

[66] Bill Hodges,  704 P.2d. at 96; Accord: Barfield v. Barfield, 742 P.2d 1107, 1112 (Okla. 1987).
[67] Bill Hodges, 704 P.2d at 9. Accord:  Barfield, 742 P.2d at 1112.

Bowers_Mort Welch 00047

Because both 36 O.S. § 3636(B) and the UM coverage of the Bowers' policy require payment of "damages", insurers must know what the undefined word means. Title 23 O.S. § 3 sets out the right to damages and its definition:  "Any person who suffers detriment from an unlawful act of another, may recover from the person at fault a compensation in money, which is called damages. Title 23 O.S. § 61 provides the measure of damages "[f]or the breach of an obligation not arising from contract… is the amount which will compensate for all detriment proximately caused thereby, whether it could be anticipated or not." Over time, a general consensus has developed as to what the "detriment" is when translated into damages recoverable in a tort claim. These include physical and mental pain and suffering, past and future; past reasonable and necessary medical expenses and the reasonable likely cost of future treatment, physical impairment, permanence of injury, disability, disfigurement, loss or wages or other income, and loss of future earning capacity. *See, e.g.*, OK UNIFORM JURY INSTS. ("OUJI") 2d—Civ. No.4.1.

Recovery for future medical treatment does not necessarily require proof of the cost of the treatment.[68] The future existence of pain and suffering is "a matter very largely within the knowledge of the insured person alone" and is allowed "where there is evidence of a permanent injury, or present pain produced thereby.[69]    Damages may be recovered for aggravation of a

---

[68] *E.g.*, M.K.O. Airline Transit Co. v. Deckard, 397 P.2d 888, 889 (Okla. 1964); Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1241-42 (10th Cir. 2005) (Okla. law.

[69] Edwards v. Chandler, 308 P.2d 295, 299 (Okla. 1957 (int. qt.. mk. omit.)

48

Bowers_Mort Welch 00048

preexisting injury or condition even if that injury or condition makes the person more susceptible to further injury than a normal healthy person.[70]

It is an insurance claims standard that a UM insurer must evaluate all of the possible elements of damages, given that they are what the insurer has contracted to pay.  The failure to consider these elements of damage has been recognized by courts applying Oklahoma law to constitute evidence of a breach of the covenant of good faith and fair dealing.[71]

### E.  Evaluation Standard.

Ultimately the insurer's goal is to evaluate and make a decision about the claim presented, and then either deny the claim or offer payment.  Absent a reasonable dispute, a "UM insured is entitled to swift payment from the insurer." Mustain v. U.S. Fid. & Guar. Co., 925 P.2d 583, 585 (Okla.1996). In such evaluation, as previously stated, the person making the evaluation must assess the available information objectively, recognizing that a first party claimant cannot be treated as an adversary.  Indeed, the AAA Claims Handling Guide describes "bad faith" in part to "mean a situation where the insurance company places its own interests above those of its insured." (1174).

---

[70] OUJI 2d – Civil. No. 4.10; Cantrell v. Henthorn, 624 P.2d 1056, 1058-59 (Okla. 1981).

[71] See e.g., Parker v. LMFIC, 2017 WL 1143787 at *8 (W.D. Okla. Jan. 31, 2017) (failure to account for documented pain and suffering in insured's medical records in initial offer to resolve UM claim); Brambl v. GEICO Gen. Ins. Co., 2015 WL 463774 at *5 (N.D. Okla. Feb. 13, 2012) (undervaluing future medical costs contrary to reports of UM Insured's treating neurosurgeon); Krajicek v. Auto Club Inter-Ins. Exch., 2009 WL 3254904 at *9 (N.D. Okla. Oct. 7, 2009) (failure to include any damages for possible two level future cervical fusion or cervical foraminotomy ignored in evaluation of UM claim); Stroud v. Liberty Mut. Ins. Co, 2016 WL 10043499 at *3-4 (N.D. Okla. Oct. 7, 2016) (pre-bad faith suit evaluations of UM claim did not include possible future surgery but post-suit evaluation by different adjuster which resulted in payment of maximum amount of UM coverage, $50,000, did take into account future surgery).

Bowers_Mort Welch 00049

Where there is equally persuasive evidence favorable to the first party claimant and not favorable to this claimant, the scales should tip in favor of the claimant, as AAA's Claim Guidelines acknowledge. The Guidelines define "bad faith" in part as "a situation where the insurance company places its own interests above those of its insured." (1174). This result is the consequence of the non-adversarial relationship between the insurer and first party claimant and the fact that insurers must give "at least equal consideration of the insured's interests as to their own interest."[72]  If a claim is not denied or paid and a first party claimant sues the insurer for payment of the claim, the insurer has an ongoing duty to evaluate the claim after suit is filed.  Even if a claim is denied pre-suit the insurer should continue to evaluate the claim if new information comes to light during litigation.[73]

The evaluation of a UM claim must address all of its required elements.  If as is common some or even most of the elements are not in doubt, the documentation of the evaluation should identify the uncontested elements.  All elements of damage for bodily injury recognized by the applicable law which are recoverable must be examined to determine which elements of damage exist.  If the evaluator questions the reasonableness of a bill for examination or treatment of a UM claimant, in my experience, he/she should recognize that the reasonableness of a charge is measured by community standards and is, to some degree, a range of charges for a particular service. Actual

---

[72]<u>Magnum Foods v. Continental Cas.</u>, *supra,* 36 F.3d at 1504 (int. qt. mks. omit.).

[73]*See e.g.,* <u>Linn v. Oklahoma Farm Bur. Mut. Ins. Co.</u>, , 479 P.3d 1013, 1021-22 (Okla. Civ. App. 2020) (fact insurer is being sued does not immunize it from the continuing duty to pay what it finds out it owes, and if it fails to pay, the failure may be further evidence of bad faith).

Bowers_Mort Welch 00050

evidence of excessive charges must exist.  If the evaluator suspects treatment was unnecessary, he/she should recognize that information must exist that will establish overtreatment or treatment was not needed in the first place.

In my experience, large insurers have online medical libraries, and, of course, medical literature is available from a number of other publicly accessible sources, with which to conduct initial assessments of injuries and to gain knowledge about anatomy, types of injuries, and the range of treatment available for the injuries. Ultimately, any argument that the amount of medical bills is excessive, or treatment was unnecessary must be supported by expert medical opinion. That is why the Bowers policy authorizes AAA to have a claimant/insured examined by a doctor of its choice, and to obtain medical reports from consultant doctors or treating doctors.

In this situation, adjusters should recognize the injured person need not produce an expert opinion that the medical bills were reasonable in amount or necessary to treat an injury. Title 12 O.S. Section 3009 expressly states "the patient, a member of the patient's family or any other person responsible for the care of the patient, shall be a competent witness to identify medical provider bills … upon a showing … such expenses were incurred in connection with the treatment of the injury, disease or disability … and it shall **not be necessary** for an expert witness to testify." (emp. add.). Even before the enactment of this law, the Oklahoma Supreme Court stated that evidence of medical bills is admissible on the issue of the value of the medical services provided to the injured party. Thus, the opposing party was required to produce evidence the charges were

**Bowers_Mort Welch 00051**

excessive in order to dispute the evidence of the amount contained in the bill as proof of the value of the services. See <u>Fixico v. Harmon</u>, 70 P.2d 114, 117-18 (Okla. 1937).

Some elements of damage for bodily injury are commonly referred to as "general damages", i.e., non-economic damages.[74] Physical and resulting mental pain and anguish resulting from an injury and treatment of the injury, permanent impairment of function, permanent disability, and loss of future earning capacity are common general damages.   Good evaluators in my experience comb the records of the claimant's healthcare providers for evidence of complaints of pain.[75]  Good evaluators interview the claimant to find out whether he/she has complaints of pain and whether they are associated with the accident in question.  The fact that the claimant can testify to his/her own physical pain and suffering makes taking a statement even more important. [76]  However, "'there is no logical or experimental correlation between the monetary value of medical services required to treat a given injury and the quantum of pain and suffering endured as a result of the injury."[77]

---

[74] *See e.g.,* <u>Government Emp'ees Ins. Co. v. Quine</u>, 264 P.3d 1245, 1247 fn. 2 (Okla. 2017).

[75] *See e.g.,* <u>Pinkett v. Dr. Leonard's Healthcare Corp.</u>, 2021 WL 1634565 at *2 (D.D.C. April 27, 2021) ("the scope of Plaintiff's medical treatment is certainly relevant" to the issue of Plaintiff's alleged pain and suffering); <u>Campbell v. Garcia</u>, 2016 WL 4769728 at *7 (D. Nev. Sept. 13, 2016) ("While the type of medical treatment that [plaintiff] received after the accident is relevant, there is no relevance between these [medical] costs and Campbell's purported pain and suffering.")

[76] *See e.g.,* <u>Reed v. Scott</u>, 820 P.2d 445, 450 (Okla. 1991); <u>Godfrey v. Meyer</u>, 933 P.2d 942, 944 (Okla. 1996).

[77] <u>Payne v. Wyeth Pharmac., Inc.</u>, 2008 WL 4890760 at *6 (E.D. Va. Nov. 12, 2008), quoting from <u>Carlson v. Bubash</u>, 639 A.2d 458, 462 (Pa. Super. 1994) app. den'd 655 A.2d 982 (Pa. 1995), quoted with approval in <u>Pinkett</u>, *supra.*, 2021 WL 1634565 at *2, <u>Campbell</u>, *supra.*, 2016 WL 4769728 at *7; and by this Court in <u>Bridges v. Wal-Mart Stores, East, LP</u>, 2021 WL 1579920 at *1 (W.D. Okla. April 21, 2021).

**Bowers_Mort Welch 00052**

Sometimes medical records contain complaints of pain but do not clarify whether the provider associates the complaints with the accident in question. If the evaluator suspects the pain complaint may not be associated with the accident in question or may suggest malingering, the evaluator can request the provider to state whether he/she believes the pain complaints are associated with the accident in question or from some other cause, or whether the complaints indicate the claimant is malingering.

In my experience, the value of physical and mental pain and suffering in non-catastrophic injury cases depends in part on the ability of the claimant to articulate the complaints. As just discussed, past pain and suffering can be established by the testimony of the injured person. This may not seem very objective, but it is reality based on the rules of evidence, my own jury trial experience and my assessment of the value of thousands of bodily injury claims where the claimant has been interviewed or deposed. When I am representing a defendant in a case to recover damages because of bodily injury I want to depose the claimant who filed suit. I can better evaluate the general damages by listening to the claimant talk about his/her pain and whether and how it restricts activities. Face-to-face interviews of claimants by adjusters are much less common today than they were earlier in my career but remain the gold standard for the same reason I take the injured person's deposition. Nevertheless, the adjuster can still benefit from taking the claimant's recorded statement and listening to how pain complaints are described and how the pain affects activities of daily living and work.

Bowers_Mort Welch 00053

There is no mathematical formula for the calculation of general damages such as past or future physical and mental pain and suffering.  This does not mean the insurer should take advantage of the lack of such a formula and minimize the value of pain and suffering.  This practice is common in evaluating third party bodily injury claims.  Unfortunately, the practice has spilled over to first party claims when insurers do not properly train and monitor claims representatives and instill recognition that a first party claim should not be handled as if the claimant is an adversary.  The need to avoid an adversarial stance toward first party claimants, as industry standards mandate, requires that a claimant's documented pain and suffering not be minimized.

**F.  Negotiation Standard.**

Because a first party claimant is not an adversary, an insurer's negotiation strategies cannot mirror the strategies used to negotiate third party claims.  Of necessity this takes away some of the advantages the insurer has in negotiating third party claims.  No time limits generally exist for an insurer to make offers on third party claims.  No rules generally prohibit offers which are less than what the insurer evaluates the claim is worth.  No obstacles exist to discourage the insurer from forcing the third-party claimant to either sue to get reasonable compensation or accept an objectively unreasonable offer and get some money now instead of years later. Moreover, a UM insurer has an affirmative duty to pay the full value of the claim under <u>Burch v. Allstate</u> if it evaluates the value of the insured's claim exceeds the limit of any applicable liability insurance, if the liability insurer has not paid its limit.

**Bowers_Mort Welch 00054**

Time limits do exist for offers to be made on first party claims.[78]  For example, insurers have 60 days from receipt of proof of loss to deny a claim or make an offer of payment.[79]  If more time is needed to investigate, an insurer can so advise the first party claimant within the 60 day window, and further 60 day extensions may be obtained if investigation remains incomplete.[80] Even without these statutory time limits, an insurer must promptly pay UM benefits, as previously discussed.

It is an industry and law standard that insurers should not force first party claimants into litigation wit "low ball" offers that are inconsistent with the non-adversarial relationship insurers should have with first party claimants.[81]  Consequently, first party insurers that recognize the nature of this non-adversarial relationship ultimately offer the highest value which the evaluator has put on a first party claim.[82]  Insurers who do not honor this standard gamble that the claimant will not sue and if he/she does sue, the insurer can always offer the highest evaluated value for the claim after suit is filed.  This is an altogether too common tactic and is inconsistent with a non-adversarial relationship.  In effect, the insurer makes a decision to take the calculated risk a first party claimant will give in, accept a low ball offer and not sue.  The insurer has a much greater

---

[78] These are contained in 36 O.S. § 1250.7, a part of the Unfair Claims Settlement Practices Act, and 36 O.S. § 3629(B).  *See* Hamilton v. Northfield Ins. Co., 473 P.3d 22, 26-28 (Okla. 2000) (recognizing purpose of the statutes is to encourage prompt payment of claims).

[79] 36 O.S. § 1250.7(A)(C); 36 O.S. § 3269(B).

[80] 36 O.S. § 1250.7(C).

[81] This aspect of the Negotiation Standard is a well-established part of Oklahoma law.  *See e.g.,* Newport v. USAA, 11 P.3d 190, 197 (Okla. 2000) (offers on UM claim below top end of evaluation); Falcone v. Liberty Mut. Ins. Co., 391 P.3d at 107 (Okla. 2017) ("Defendant offered less than the maximum amount of its evaluations after taking the position the L2 trauma treatment was unwarranted"); Miller v. Liberty Mut. Fire Ins. Co., 191 P.3d 1221, 1225 (Okla. Civ. App. 2008) (last offer on UM claim was $20,763 where insurer had evaluated claim at a range of $16,353 to $30,963).

[82] See Falcone v. Liberty Mut. Ins. Co., 391 P.3d 105, 107 (Okla. 2017) (reversing summary judgment for insured in UM bad faith case in part because insured "offered less than the amount of its evaluations).

Bowers_Mort Welch 00055

ability to absorb this risk than a first party claimant.  However, exercising this financial strength in the negotiation of any one individual claim is inconsistent with the non-adversarial nature of an insurer's relationship with a first party claimant/insured.

### G.  Internal Insurance Company Standards.

Insurance companies should have internal standards for the handling of claims:

[L]ack of formal operational policies and procedures can have a detrimental effect on the claims organization….Policy and procedures guide the staff in addressing operational requirements, technical claims handling issues, development of a consistent approach to claims handling and establishment of a foundation to create ongoing goals and objectives. Of the many types of internal company standards which should be formalized, the one probably most important in the context of a bad faith case is the so-called "claims manual" which "[d]etail[s] the processes and procedures in handling claims".[83]

In my experience, a claims manual, by which I mean a collection of internal explanations of how to adjust claims, can greatly assist in the training of claims personnel and provide a ready reference guide when personnel have questions in the course of processing a specific claim.  These manuals may be hard copy or in electronic form and may be called something different.  They may be in one all-inclusive document or in separate documents which address different subjects.

Commonly, these manuals explain the basic principles for the interpretation of insurance policies, provide a step-by-step explanation of relevant policy language, and explain how the process and systems of the company operate.  Such a manual normally describes information that should be obtained in the investigation of a claim, and the ways in which such information can be

---

[83] *Claims Operations, supra,* at 78.

**Bowers_Mort Welch 00056**

obtained. A good claims manual explains how to evaluate a claim, along with how to process it within the organizational structure of the insurer. These manuals also explain how and when to communicate with a claimant/insured. And, they explain what must be documented in the claim file. Finally, most claims manuals I have reviewed in recent years include a description of the covenant of good faith and fair dealing, general insurance laws such as unfair claims practices acts that apply to claims handling, and laws that apply to specific policies or claims under specific policies. [84]

Typically, knowledge of all the standards described, *supra*, is conveyed to claims personnel in their training during which claims manuals are among the source material used to train.[85] This is because the insurance industry recognizes that adequate training is necessary to minimize the risk that claims which should be paid are paid, and claims which should not be paid are not paid. Moreover, in my experience, published standards assist management in evaluating the performance of claim handling because they provide objective measures by which to evaluate employee performance.

---

[84] *See e.g.,* Aggressive Good Faith, at 87, a book intended for use by claims personnel seeking the designation of Associate in Claims (AIC), where the authors recommend the reader "memorize the substance of the fourteen points" in the Model Unfair Claims Practices Act.

[85] *See e.g., Claims Operations, supra.,* at 1, 78-79.

Bowers_Mort Welch 00057

## X. Violations of Standards

AAA violated several standards in the course of investigating, evaluating, and negotiating Tamra Bowers' UM claim. As a result of these violations, AAA offered an unreasonably small amount to compensate Ms. Bowers for the damages she is legally entitled to recover from the driver of the vehicle which crossed all lines of traffic into Bowers' lane of travel and caused Bowers' Chrysler to collide with the non-yielding vehicle. And, AAA unreasonably delayed making the highest offer it did finally make.

**A.** When AAA received Tamra Bowers' medical bills and records with her lawyer's 9-3-21 letter, it had all the information needed to evaluate Bowers' UM claim properly. AAA knew by January 2021 that the other driver was at fault in causing the collision with Bowers' car; Bowers broke her arm, had it cast, and was sent to a surgeon to secure the fracture surgically so it healed in proper alignment; the doctor would not see Bowers because he would not bill the other driver's insurer and Tamra Bowers' husband had been told by the Bowers' health plan, Blue Cross, that it would not pay for treatment of an auto accident injury; and the at-fault driver had liability insurance of $30,000. Thus, the only issue AAA had to address was the amount of damages Bowers sustained when it received Scott Ray's 9-3-21 letter with medical records and bills.

**Bowers_Mort Welch 00058**

AAA did not try to communicate with Steven Arnold, the doctor who eventually did agree to see Bowers in early February, to find out whether his comments in his records that Bowers was "non-compliant" with treatment by taking off her cast and later her removable substitute for the initial cast. Nor did AAA contact the therapist who treated Bowers to find out whether her termination of therapy—due to transportation issues—had any effect on her recovery. This was a violation of the Investigative Standard.

The Bowers' policy expressly provides that AAA can contact an insured person's healthcare provider for just this kind of information. Instead of doing so, an adjuster who had only been adjusting injury claims since sometime in 2018, decided that the reported non-compliance and early termination of therapy reduced the value of Bowers' claim. The adjuster did not consult any resources that discuss "cast anxiety" and explain why some patients take off their casts—as the published medical literature Scott Ray subsequently quoted to the adjuster shows. The adjuster also failed to recognize that Bowers' therapy had resulted in improvement in her arm/wrist function and strength, notwithstanding that she had to quit therapy before the scheduled end date. The adjuster either ignored or failed to realize that a claimant's failure to do something a provider recommends is relevant to evaluating damages **only** if the failure exacerbated the injury or inhibited recovery. AAA had no evidence either thing occurred in September 2021. This violated the Investigation, Knowledge of Law, and Evaluation Standards.

**Bowers_Mort Welch 00059**

Although the Bowers' policy gives AAA the right to take a recorded statement from a claimant, the adjuster did not take a statement from Bowers after she received her medical records and bills and before she concluded her first evaluation of the UM claim. Instead, she waited over nine months, until March 18, 2022, to take the statement. This was a violation of the Investigation Standard.

Had the adjuster taken the statement then (instead of nine months later in March 2022), she and thus AAA would have learned that Bowers continued to have daily pain in her arm; her use of the arm was restricted; she was unable to perform basic functions and had to find alternative ways to carry out others; she did hard labor on the family farm including tending a garden in which she grew crops for sale--these activities she could no longer perform or performed with more effort and with pain; she developed claustrophobia about the cast which led her to take it off; she understood and performed the home therapy which the therapist had taught her to do at home; she lost income from not being able to sell her garden produce; she became distressed because she could no longer do her part in her marriage while her husband worked a full-time job off the farm. The policy also gave AAA the right to have Bowers examined by a doctor of its choice. Still, AAA failed to consider such an examination to address the issues it decided to have a doctor address 11 months later (and which Dr. Brantley addressed in a report provided to Bowers' lawyer over a year after AAA received Bowers' medical records and bills). This was a violation of the Investigation Standard.

**Bowers_Mort Welch 00060**

AAA eventually got around to taking Bowers' statement and having her examined by a doctor. After each of these events, AAA increased the amount of its evaluation of Bowers' total damages and thus the amount it offered Bowers on her UM claim. By delaying the preceding activities, AAA did not have the information it should have obtained right after it received Bowers' medical records and bills. Thus, AAA's initial evaluation and offer of payment were unreasonably low, as the subsequent evaluations and offers made after Bowers' statement and examination demonstrate. The delayed performance of an adequate investigation resulted in a delayed evaluation and offer of the top dollar, which AAA eventually made in January 2023, over two years after Mrs. Bowers was hurt. AAA violated the Evaluation and Negotiation Standards by initially evaluating Bowers' claim without an adequate investigation, which was delayed without any plausible basis until prodded by Bowers' lawyer in multiple letters to reconsider the initial evaluation and offer.

**Bowers_Mort Welch 00061**

**B.** In his September 3, 2021, letter transmitting bills and records, Ray quotes from and cites medical literature showing a person with an intra-articular fracture is at high risk of developing post-traumatic osteoarthritis (PTOA). The adjuster did not read the quoted and cited medical literature. Nor did she seek out other resources to see if the cited literature represents the prevailing view in the medical community. She also did not communicate with Dr. Arnold, who put Bowers' arm in a cast, to see if he agreed with the medical literature. As discussed in the previous subsection, AAA had the right to communicate with a claimant's doctors under the terms of the policy. Finally, AAA did not reach out to a doctor of its choosing to evaluate the cited literature or seek the doctor's opinion about whether the literature represented the prevailing view (although months later, AAA did schedule an exam of Bowers by an orthopedic doctor who confirmed Bowers was at risk to develop PTOA, just as the literature Ray referenced and quoted in his September 3, 2021 letter stated).

These failures to act violated the Investigation Standard. The failures caused AAA's initial evaluation of damages and its initial offer to be unreasonably low, a violation of the Evaluation and Negotiation Standards. Had AAA been proactive and sought out a doctor to ask if Scott Ray was right and examine Mrs. Bowers when the records and bills were received, the ultimate evaluation and offers AAA made in late 2022 and January 2023 should have been made much earlier. Thus, the delayed investigation contributed to a delay in AAA making the best offer it ever made until January 2023, over two years after the accident and 15 months after AAA had the medical bills and records, and knowledge of the medical literature on the risk of parties, like Mrs. Bowers, who have an intra-articular fracture, to develop PTOA. The inadequate, delayed

**Bowers_Mort Welch 00062**

investigation thus led to a delay in performing an evaluation, which led to delaying AAA's highest offer, a violation of the Evaluation and Negotiation Standards.

**C.** Every evaluation made of Bowers' damages had a range of General Damages, which led in turn to a range in the amount of the sum to be offered on the claim. While utilizing a range of General Damages is appropriate because these damages are not arithmetically calculable, AAA had its adjuster offer less than the top of the range of UM benefits the adjuster was authorized to offer. This occurred on the occasion of every offer, from the first offer made by telephone on 9-30-21 to the last offers made on 10-28-22 and 1-5-23.

All of AAA's offers were "low-ball" offers that violated the Negotiation and Knowledge of Law Standards. The use of this negotiation technique shows that AAA treated Bower like a third party claimant with an adversarial relationship with a **liability** insurer. A first party claimant is not a UM insurer's adversary; hence, the requirement is that the insurer put the full amount of its evaluation on the settlement table.

**D.** The claim file does not contain any explanation for the General Damages evaluations conducted by AAA's adjuster. This is a violation of the Documentation Standard. No one can determine whether this evaluation considered every element of potentially recoverable damages from looking at the claim file, the sum allocated to the various elements of damage, or whether no

63

**Bowers_Mort Welch 00063**

value was assigned to some elements of damages. Even when Bowers' lawyer repeatedly requested the allocation of General Damages made by AAA to explain AAA's position to his client (letters dated 5-2-22, 9-13-22, 10-11-22, 11-21-22), AAA refused to provide an allocation. This was a violation of the Communication Standard, which requires an insurer to explain the basis for its claim decision.

The only justification AAA offered for this repeated refusal is the analogy of AAA's position as a UM insurer owing a duty of good faith and fair dealing to Mrs. Bowers, its insured, and a jury instructed to return a general verdict fixing a total sum of damages for an injured party. See 11-6-22 Frantz-Ray letter (1161). The analogy is flawed. A jury is required by standard jury instructions and verdict forms to fix the total amount of damages it finds a party sustained. An insurer handling a first-party claim is bound by industry standards and laws, which require a documented explanation for evaluating damages and disclosing the explanation to the first-party claimant when requested. In short, a jury owes no duty of good faith and fair dealing to a plaintiff, while an insurer does owe this duty (with its attendant specific responsibilities) to a first-party claimant. The claim file contains no evidence of any reasoning for refusing to disclose AAA's allocation of General Damages to specific elements of recoverable damages. This is another violation of the Documentation Standard. Nor does the file disclose how AAA concluded it should be treated like a jury instructed to return a general verdict in a lump sum for damages. This is also a violation of the Documentation Standard.

**Bowers_Mort Welch 00064**

**E.** The only plausible conclusion I can draw from the absence of any allocation of damages in the claim file, any discussion of the element of General Damages in the claim file, and no explanation in the claim file for the "CSAA is like a jury" analogy is this—the adjuster (and her supervisors who approved her evaluations and authorized the offers she made) did not consider a monetary sum for each element of recoverable damages, a violation of the Evaluation Standard.

AAA had evidence of Mrs. Bowers' physical pain and suffering, permanent impairment of function, and permanent disability when it received the medical records with Ray's September 3, 2021 letter. The x-rays showed a malunited healing intra-articular fracture of the distal radius--the wrist. The records describe pain associated with the fracture, limited motion, and weakness of the upper right extremity, which improved with therapy but did not go away entirely. Ray's September 3, 2021 letter quotes medical literature supporting that Bowers is at risk of future adverse consequences from the intra-articular fracture—PTOA, a future, permanent injury that causes pain and limits function. But nowhere, in the initial evaluation of Bowers' damages, is there any discussion of permanent impairment and disability or future complication of the injury. How is anyone to know these elements of damages were actually considered in the evaluation?

The only possible clue is the definition of "General Damages" in AAA's Claims Handling Guide: "General damages are what the law allows for pain and suffering resulting from an injury. The manner of measuring pain and suffering depends on the circumstances…." (1195). This definition is incorrect. It fails to include all of the potentially recoverable elements of non-

**Bowers_Mort Welch 00065**

economic damages identified in OUJI 2d-4.1 and case law, including, for example, permanent impairment and disability and cost of future treatment. The definition also fails to distinguish between past and future pain and suffering and physical and mental pain and suffering.

The absence of any discussion of these elements of damage is a violation of the Documentation Standard, and it means there is no evidence that the actual monetary range assigned to General Damages included these elements, a violation of the Evaluation Standard. Given the erroneous definition of General Damages, it is also reasonable to conclude the evaluation only considered physical pain and suffering.

F.  Similarly, once Bowers' recorded statement was taken and she explained how the injury affected her—regular pain, limited motion and strength—and how these limitations impacted her ability to maintain the farm and garden, claustrophobia and depression, there is no evidence in the claim file that AAA's adjuster increased the amount for any particular element of damage. The initial General Damages range was slightly increased—by $3,000—indicating AAA did not consider Mrs. Bowers' description of the consequences of her injury to be very persuasive. But aside from that conclusion, the failure to document the values placed on each element of damages is a violation of the Documentation Standard and leaves a person looking at the claim file without any rational basis to determine how General Damages were calculated other than by reference to AAA's erroneous definition of the term in its Claims Handling Guide.

Bowers_Mort Welch 00066

The same problem arose once Ray advised AAA of the cost of prescription pain medication to relieve discomfort from PTOA. See 10-11-22 Ray-Frantz letter (1132). Given Bowers continued to have daily physical pain when her statement was taken on 3-18-22, over 27 months after the injury, and is at risk of developing PTOA with its pain-inducing characteristics, future expense for pain medicine was a recoverable element of damage, which should have been included in AAA's evaluations. A violation of the Evaluation Standard occurred by failing to include this element of damage which according to Ray's quoted statistics would amount to over half of the amount of UM coverage.

Ray's 11-11-22 letter to the adjuster provides statistics on the cost of such pain medication. Still, the claim file does not show the adjuster disputed these figures or sought out other sources of information about the cost of palliative care for PTOA. Nor did AAA ever ask the examining physician it finally selected to address whether such palliative care for PTOA would likely be needed, even though the doctor confirmed Mrs. Bowers is at risk of developing PTOA. This was a violation of the Investigation Standard. The net result of failing to identify elements of General Damages and either allocate a specific sum to each element (including zero) was to confine the evaluations at best to some amount for physical pain and suffering, based on AAA's erroneous definition of General Damages. This was a violation of the Evaluation Standard, which resulted in consistently undervaluing Mrs. Bowers' UM claim and, thus, inadequate offers of payment, a violation of the Negotiation Standard.

Bowers_Mort Welch 00067

**G.** AAA has produced no training material for the actual adjustment of UM claims, evaluation of damages, or how to adjust claims consistent with the legal duty of good faith and fair dealing. This is a violation of the Training Standard. According to the adjuster assigned to Mrs. Bowers' claim, she received one week of in-house classroom training when she was hired by AAA as a casualty specialist in 2018 (Frantz dep. 18-19). She could not recall any other specific formal training on Oklahoma UM claims or handling bodily injury claims. (*Id.* 23, 26-27). She testified "AAA does not have a written policy, process or procedure for the handling of UM or UIM claims." (*Id.* 81-82). Her training in the evaluation of bodily injury claims was "on the floor through discussion with her supervisor and colleagues. (*Id.* 23). However, with the spread of COVID-19, AAA sent their adjusters home to work and Frantz continues to work from home to this day. Consequently, it is not possible to walk over to a supervisor's desk with a question.

The handling of Mrs. Bowers' claim was consistent with the typical adversarial manner in which third-party bodily injury claims are handled by some insurers. The process was dragged out from the prompt reporting of the accident in December 2020 to the last offer made in January 2023. Each offer made by AAA was in small incremental increases. No offer was ever made at the top of AAA's then-current evaluation range. The delay reflects a lack of understanding of the requirement for prompt investigation, evaluation, and payment. The "lowball" offers are a typical third party negotiation tactic, evidencing a lack of training on the critical distinction between first and third party claims. The relationship between an insurer and first party claimant is **not** adversarial. The failure or refusal to consider the medical literature quoted and cited by Bowers' lawyer reflects a lack of understanding of the requirement to give the insured/claimant's interest

Bowers_Mort Welch 00068

at least as much weight as the insurer's interest. The medical literature addressed issues raised by the adjuster about Bowers' "non-compliant" cast removal and the risk of future consequences from her intra-articular radius fracture (subjects addressed months later by the doctor hired by AAA).

The failure to promptly take Mrs. Bowers' statement and schedule an examination by a doctor AA's vendor selected, reflect a lack of understanding of the need to be proactive on first party claims and expedite their handling. This priority is, as previously discussed, manifest in the time limits which apply to first party claims handling in the Model Act and Oklahoma law.

The adjuster AAA assigned was so inexperienced that she did not know (and did not try to find out) what an "intra-articular fracture" is and why it presents significant risk for development of PTOA. (Frantz depo. 131-32). Adjusters must understand basic anatomy and common injuries in motor vehicle accidents. Frantz was not provided any basic medical knowledge identified in discovery by AAA. As previously discussed, a proper evaluation cannot be performed if the evaluator does not know and understand the relevant facts and law.

The lack of any internal discussion of the multiple elements of Bowers' general damages evidences a lack of training on the reasons why discussion of all elements of potential damages is necessary document in a first party claim file. The risk that one or more elements of damages will be overlooked is increased without this documentation. Moreover, the lack of documentation calls into question the evaluator's knowledge and training on these elements of damages. Certainly, the

Bowers_Mort Welch 00069

erroneous definition of "general damages" in the Claim Handling Guide (1195) didn't help adjusters because it leaves out several types of non-economic losses.

Finally, the repeated refusal to tell Bowers' lawyer how AAA allocated General Damages in its evaluations of his client's claim is more evidence of a lack of training on the fundamental precepts of the duty of good faith and fair dealing which precludes an adversarial relationship between a first party claimant and her insurer. Communicating the basis of a first party insurer's evaluation is the industry standard because a first party claimant is entitled to be treated fairly. She (and her lawyer) cannot assess whether the insurer is dealing fairly without any knowledge of how the insurer arrived at its evaluation (in this case, AAA's evaluation of General Damages). AAA offered no plausible reason for not disclosing the basis for its General Damages evaluation (the AAA jury analogy is certainly not a legitimate reason). The only reason the claim file reveals is derived from the absence of any discussion of the various elements of General Damages--no such allocation was performed. Thus, one is left with the only logical deduction—only pain and suffering were considered, consistent with AAA's erroneous Claims Handling Guide definition of General Damages.

In summary, the mishandling of Ms. Bowers' UM claim, which violated several industry standards, resulted from an institutional failure to provide proper training to claims handling employees,  including the adjuster assigned to the Bowers' claim. This was a violation of the Training Standard.

**Bowers_Mort Welch 00070**

Very truly yours,

*Mort G. Welch*

Mort G. Welch

/Attachments

Bowers_Mort Welch 00071

# CURRICULUM VITAE OF MORT G. WELCH

## I.    EDUCATION:

Broken Bow High School, Broken Bow, Oklahoma, Valedictorian 1968;

University of Oklahoma, Bachelor of Arts degree with Special Distinction,
     Phi Beta Kappa, 1972;

University of Texas at Austin School of Law, Juris Doctorate degree, American Jurisprudence Award
     (Conflicts of Law, Wills & Estates) 1975.

## II.    EMPLOYMENT:

Law Clerk – Attorney General of New Mexico, Santa Fe, New Mexico, Summer 1973;

Law Clerk – Cooper, Stewart, Elder & Abowitz, Oklahoma City, Oklahoma, Summer 1974;

Associate, Johnson & Davis, Harlingen, Texas, 1975-76;

Associate, Cooper, Stewart, Elder & Abowitz, Oklahoma City, Oklahoma 1976-78;

Partner/Shareholder, Abowitz & Welch, later Abowitz, Welch & Rhodes, 1978-95;

Solo practitioner, 1995;

Shareholder, Welch, Jones & Smith, P.C. now Welch & Smith, P.C. 1996-present.

Adjunct Professor, Oklahoma City University Law School.

## III.    COURT ADMISSIONS:

Admitted to practice law in the State of Texas, 1975 (no longer active) and the State of Oklahoma, 1976;

Also admitted to practice before the United States Supreme Court (1999), Tenth Circuit United States Court of Appeal (1977), United States District Court for the Western District of Oklahoma (1977), and United States District Court for the Northern District of Oklahoma (1979);

Admitted to practice *pro hac vice* before state and federal trial and appellate courts in Arizona, Arkansas, California, Illinois, Iowa, Kansas, Missouri, New Jersey, New Mexico, Ohio, Pennsylvania, and Texas.

## IV.    PROFESSIONAL ASSOCIATIONS:

Member, Oklahoma Bar Association; former member, International Association of Defense Counsel; former member, State Bar of Texas and Oklahoma Association of Defense Counsel.

Bowers_Mort Welch 00072

## V.    OTHER

Oklahoma Super Lawyer, Insurance, 2009-2022, Business Super Lawyer 2017.

## VI.    CONTINUING LEGAL EDUCATION PARTICIPATION:

Lectured and prepared seminar materials for continuing education programs sponsored and approved by the Oklahoma Bar Association, Oklahoma Insurance Department, and also sponsored by the Oklahoma Association of Defense Counsel, Oklahoma Association for Justice f/k/a Oklahoma Trial Lawyers Association, University of Oklahoma School of Law, Oklahoma City University School of Law, and The Conference on Consumer Finance Law.  Selected titles include:  *Allocation of Fault-Identifying All Angles*, OBA  CLE  (Feb. 1989); *Identifying and Using Insurance Coverages Commercial Liability*, OBA  CLE  (Feb. 1990); *Documenting the Agreement,* OBA  CLE (Dec. 1991 and Mar. 1995); *Replacement Cost Property Insurance Coverage Without Replacement: Coblentz v. Oklahoma Farm Bureau Mut. Ins. Co.;* The Conf. on Cons. Fin. Law (Dec. 1996); *There are Many People Who Want Your Client's UM Money: Pitfalls in the Settlement of UM Claims*, OBA & Oklahoma Insurance Department approved CE (Oct. 2009); and *Substantial Certainty Tort Claims By Injured Employees Against Their Employers: What Workers Compensation Professionals Should Know*, 11th Annual Spring Insurance Update Seminar (April, 2010).  I was program planner and moderator for the OBA CLE Seminar, *What The Other UM Seminars Didn't Tell you: How To Settle And (If All Else Fails) Try UM Cases* (Oct. 2009).  *Basic Elements of Auto Liability Coverage and Case Law Restrictions, What Must be Proved to Prevail on a UM Claim, The Interface Between Auto Liability and UM Coverages when the Claim's Value Potentially Exceeds the Liability Coverage Limit,* Last Minute Continuing Legal Education (Leflore County Bar Ass'n. Dec. 16, 2010).

## VII.    TRIAL OR APPELLATE COUNSEL IN THE FOLLOWING CASES   RESULTING   IN OFFICIALLY AND UNOFFICIALLY PUBLISHED COURT OPINIONS:

Akin v. Ashland Chem. Co., 156 F.3d 1030 (10th Cir. 1998) *cert. den'd* 526 U.S. 1112 (1994); Alea London Ltd. v. Canal Club, Inc., 231 P.3d 157 (Okla. Civ. App. 2009); Allstate Ins. Co. v. Fox, 139 F.3d 911 (Tab.), 1998 WL 77745 (10th Cir. 1998); American Farmers & Ranchers Mutual Insurance Company v. Shelter Mutual Insurance Company, 267 P.3d 147 (Okla. Civ. App. 2011); American Interstate Ins. Co. v. Wilson Paving & Excavating, Inc., 2010 WL 2624133 (N.D. Okla. June 25, 2010); Angelo v. Armstrong World Industries, 11 F.3d 957 (10th Cir. 1993); Arnold v. Continental Cas. Co., 2012 WL 12863977 (W.D. Okla. Nov. 26, 2012); Barnard v. Sutton, 321 P.3d 999 (Okla. Civ. App. 2013); Beeman v. Manville Corp. Asbestos Disease Compensation Fund, 496 N.W.2d 247 (Iowa 1983); Bristol v. Fibreboard Corp., 789 F.2d 846 (10th Cir. 1986); Case v. Fibreboard Corp., 743 P.2d 1062 (Okla. 1987); Cofer v. Morton, 784 P.2d 67 (Okla. 1989); Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982), *app. after remand*, 827 F.2d 667 (10th Cir. 1987); Condray v. Unum Life Ins. Co. of Am., 2009 WL 1312515 (W.D. Okla. May 7, 2009); Day v. Great Northwest Ins. Co., 2021 WL 5408414 (W.D. Okla. Feb. 3, 2021); First Financial Ins. Co. v. Roach, 80 F.3d 420 (10th Cir. 1996); Fisher v. Owens Corning Fiberglass Corp., 868 F.2d 1175 (10th Cir. 1989); Fleming v. Hall, 638 P.2d 1115 (Okla. 1981); Gonzalez v. Dub Ross Co., Inc., 224 P.3d 1283, (Okla. Civ. App. 2009); Grain Dealers Mut. Ins. Co. v. Farmers Alliance Mut. Ins. Co., 298 F.3d 1178 (10th Cir. 2002); GuideOne Mutual Ins. Co. v. The Shore Ins. Agy., 259 P.3d 864 (Okla. Civ. App. 2011); Hanover Am. Ins. Co. v. Balfour, 594 Fed.Appx. 526

2

(10th Cir. 2015); <u>Horace Mann Ins. Co. v. Johnson</u>, 953 F.2d 575 (10th Cir. 1991); <u>Huff v. Fibreboard Corp.</u>, 836 F.2d 473 (10th Cir. 1987); <u>Kerr-McGee Corp. v. Admiral Ins. Co.</u>, 905 P.2d 760 (Okla. 1995); <u>Lindsey v. Dayton-Hudson Corp.</u>, 592 F.2d 1118 (10th Cir.), *cert. den'd.* 444 U.S. 856 (1979); <u>Livengood v. Thetford</u>, 681 F.Supp. 695 (W.D. Okla. 1988); <u>MTI, Inc. v. Employers Ins. Co. of Wausau</u>, 2017 WL 11139930 (W.D. Okla. Dec. 21, 2017); <u>Mulford v. Neal</u>, 264 P3d 1173 (Okla. 2011); <u>Oklahoma Farmers Union Mut. Ins. Co. v. John Deere Ins. Co.</u>, 967 P.2d 479 (Okla. Civ. App. 1998); <u>Poteau Ford Mercury, Inc. v. Zurich Am. Ins. Co.</u>, 2009 WL 9508739 (Okla. Civ. App.); <u>Ray v. Oklahoma Heritage Home Care, Inc.</u>, 2013 WL 2368808 (W.D. Okla.); <u>Republic Underwriters Ins. Co. v. Moore</u>, 493 Fed.Appx. 907 (10th Cir. 2010); <u>Sargent v. Central Nat'l Bank & Trust Co. of Enid, Oklahoma</u>, 809 P.2d 1298 (Okla. 1991); <u>Short v. Oklahoma Farmers Union</u>, 619 P.2d 588 (Okla. 1980); <u>Snethen v. Oklahoma State Union of the Farmers' Edu. and Coop. Union of Am.</u>, 664 P.2d 377 (Okla. 1983); <u>State Farm Mut. Ins. Co. v. Schwartz</u>, 933 F.2d 848 (10th Cir. 1991); <u>Takagi v. Wilson Foods Corp.</u>, 662 P.2d 308 (Okla. 1983) (amicus curiae); <u>Tax Investments Concepts Inc. v. McLaughlin</u>, 670 P.2d 981 (Okla. 1982); <u>Thiry v. Armstrong World Industries, Inc.</u>, 661 P.2d 515 (Okla. 1983); <u>Timberlake Const. Co. v. U.S. Fid. & Guar. Co.</u>, 71 F.3d 335 (10th Cir. 1995); <u>Tinker Fed. Credit Union v. State Farm Auto. Ins. Co.</u>, 2013 WL 12092539 (W.D. Okla. May 15, 2013); <u>Trinity Univ. Ins. Co. v. Broussard</u>, 932 F.Supp. 1307 (N.D. Okla. 1996); <u>Vilseck v. Fibreboard Corp.</u>, 861 S.W.2d 659 (Mo. App. 1993); <u>Wever v. State ex rel. Dept. of Human Serv.</u>, 839 P.2d 672 (Okla. Civ. App. 1990); <u>Wilson and Co. v. Reed</u>, 603 P.2d 1172 (Okla. Civ. App. 1979); <u>Wilson Foods Corp. v. Noble</u>, 613 P.2d 485 (Okla. Civ. App. 1980); <u>Wilson Foods Corp. v. Porter</u>, 612 P.2d 261 (Okla. 1980); <u>Zurich American Ins. Co. v. Good To Go, LLC et al.</u>, 2018 WL 83333413 (W.D. Okla. Jan. 2, 2018); and <u>Zurich American Ins. Co. v. Good To Go, LLC et al.</u>, 2019 WL 3976849 (W.D. Okla. Aug. 22, 2019).

**VIII.    REPRESENTATIVE CURRENT ORGANIZATIONAL CLIENTS:**
AIX Specialty Insurance Company
American Farmers & Ranchers Mutual Insurance Company
Amerisafe Group
Berkley National Insurance Company
Central Mutual Insurance Company
CNA Insurance Group
Great Northwest Insurance Company
Hallmark Insurance Group
Hanover Insurance Group
Markel Group
Oklahoma Attorneys Mutual Insurance Company
Tinker Federal Credit Union
Tractor Supply Company
Westwind Management, Inc.

**IX.    REPRESENTATIVE EXPERT WITNESS AND CONSULTANT CLIENTS:**
Ed Abel and Luke Abel, The Abel Law Firm, Oklahoma City, Oklahoma
Murray E. Abowitz (deceased), Oklahoma City, Oklahoma
Robert D. Allen, The Allen Law Group
Robert D. Anderle, Seeley, Savidge, Ebert & Gourash Co., LPA, Cleveland, Ohio
Jeff Beeler and Derrick Teague, Jennings, Teague, P.C., Oklahoma City, Oklahoma
Brock C. Bowers, Hiltgen & Brewer, P.C., Oklahoma City, Oklahoma

**Bowers_Mort Welch 00074**

Darin L. Brooks, Gray, Reed & McGraw LLP, Houston, Texas
Rachel L. Bussett, Bussett Law Firm, Oklahoma City, Oklahoma
Michael C. Duncan, Chubbuck, Duncan & Robey, P.C., Oklahoma City, Oklahoma
Steven E. Clark, Clark & Mitchell, Oklahoma City, Oklahoma
David H. Cole, Oklahoma City, Oklahoma
Thomas F. Cordell, Jr., Edmond, Oklahoma
Jack Dawson, Miller, Dollarhide, Oklahoma City, Oklahoma
David Donchin, Michael Darrah, Durbin, Larimore & Bialick,
        Oklahoma City, Oklahoma
Whitney Eschenheimer, Johnson & Jones, P.C., Tulsa, Oklahoma
Kelly A. George, Burch/George/Germany, Oklahoma City, Oklahoma
Bradley A. Gungoll and Wade Gungoll, Gungoll, Jackson, Collins, Box & Devoll, P.C.,
        Oklahoma City, Oklahoma
Duke Halley, Halley, Talbot & Smithton, Oklahoma City and Woodward, Oklahoma
Chris Harper, Chris Harper, Inc., Oklahoma City, Oklahoma
David P. Henry, Oklahoma City, Oklahoma
Michael W. Hogan, McAlester, Oklahoma
Steven E. Holden, Holden P.C., Tulsa, Oklahoma and Dallas, Texas
Richard E. Hornbeek, Hornbeek, Vitali & Braun, Oklahoma City, Oklahoma
Logan Johnson and Brad Miller, Miller, Johnson, Jones, Antonisse & White, Oklahoma
        City, Oklahoma
Robert J. Killeen, Jr., Killeen & Stern, P.C., Houston, Texas
Locke Lord LLP, Chicago, Illinois
Joseph A. Hinkhouse, Hinkhouse, Williams, Walsh LLP, Chicago, Illinois
Greg W. Luther, Oklahoma City, Oklahoma
Michael McGrew, McGrew, McGrew & Associates, Oklahoma City, Oklahoma
Kent McGuire, McGuire Law Firm, Edmond, Oklahoma
Gerard F. Pignato and Patrick M. Ryan, Ryan Whaley Oklahoma City, Oklahoma
Robert Rivera, Jr., Susman, Godfrey, L.L.P., Houston, Texas
Ruberry, Stalmack & Garvey, LLC, Chicago, Illinois
James M. Secrest II and Roger N. Butler, Jr., Secrest, Hill, Butler & Secrest, Tulsa, Oklahoma
W.G. "Gil" Steidley (deceased), and C.D. "Buddy" Neal, Steidley & Neal, McAlester and Tulsa,
        Oklahoma
David Taylor and Ellen Van Meir, Thompson, Coe, Cousins & Irons, LP, Dallas, Texas
C. William Threlkeld and Albert Louis Tait (deceased), Fenton, Fenton, Smith, Reneau & Moon,
        Oklahoma City, Oklahoma
Richard S. Toon, Toon/Osmond, Tulsa, Oklahoma
Jason Waddell, Waddell Law, Oklahoma City, Oklahoma
Micky Walsh, Oklahoma City, Oklahoma
Bradley C. West, The West Law Firm, Shawnee, Oklahoma
Joe E White, Jr. and Charles C. Weddle, White & Weddle P.C.,
    Oklahoma City, Oklahoma
Reggie Whitten and Revell Parrish,Whitten Burrage Law Firm, Oklahoma City, Oklahoma
J. Todd Woolery, Hall, Estill, Hardwick, Gable, Golden & Nelson, A P.C., Oklahoma City,
        Oklahoma
Ace Insurance Group

Bowers_Mort Welch 00075

AIG Companies
American National Property and Casualty Companies
American States Insurance Company
Central Mutual Insurance Company
Chubb Insurance Group
Gray Insurance Company
Great American Insurance Company
GEICO
Liberty Mutual Insurance Group
Mid-Continent Casualty Company
National American Insurance Company
North Star Mutual Insurance Company
Northwestern Pacific Indemnity Company
Safeco Insurance Company

## X.    EXPERT TESTIMONY:

Testimony by deposition as an expert witness in the following insurance coverage and insurance bad faith cases:

Allen v. Lynn Hickey Dodge, No. CJ-96-6076, District Court of Oklahoma County, Oklahoma, on February 7, 2003 for the plaintiffs and their attorney, Ed Abel; Anders v. GEICO, No. CJ-2002-6387, District Court of Tulsa County, Oklahoma, on September 18 and September 19, 2003 for the defendant GEICO and its attorney, Jerry Pignato; Arrow Exterminators Inc. v. Mid-Continent Cas. Co., No. CJ-2000-1558, District Court of Tulsa County, Oklahoma, on June 3, 2004 for the defendant, Mid-Continent Casualty Co. and its attorney, Roger Butler; Brookwood Storage Partnership LLC v. Employers Mut. Cas. Co., Wedel Group X LLC v. Employers Mut. Cas. Co. , Case No. 11-CV-1110-F, United States District Court for the Western District of Oklahoma, for plaintiffs and their attorney, Mike McGrew; Gary Billings, Limited Guardian of the Person of Donald Billings, An Incapacitated Person, v. Conseco Health Ins. Co.,No. 10-CV-372-M, United States District Court for the Western District of Oklahoma on February 1, 2012 for the plaintiff and his attorney Simone Gosnell Fulmer; GuideOne Mut. Ins. Co. v. Smith, No. CIV-03-1087-F, United States District Court for the Western District of Oklahoma, on October 28, 2004 for the defendants and their attorney, Joe E. White, Jr.; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co., No. CJ-04-7542-62, District Court of Oklahoma County, Oklahoma on November 16, 2005 for the defendant and its attorney, David Donchin; Hayes v. State Farm Fire and Casualty Company, No. CJ-2009-8864, District Court of Oklahoma County, Oklahoma on September 13, 2011 for the plaintiff and his attorney, Rachel Bussett; Horn v. GEICO, No. CIV-02-0058, United States District Court for the Western District of Oklahoma, on October 10, 2002 for the defendant GEICO and its attorneys, Robert Allen and Abel Leal; Hutchinson v. United Services Auto. Assoc., No. C-98-596, District Court of Pittsburg County, Oklahoma for the defendant, Oklahoma Farmers Union Mutual Insurance Company and its attorney, W. G. "Gil" Steidley; Melton Truck Lines Inc. v. Indemnity Ins. Co. of North America, No. CV-263-JHP-SHA, Northern District of Oklahoma, on August 2, 2007 for the defendant and its attorney, Robert Rivera, Jr.; Ward v. Oklahoma Farmers Union Mut. Ins. Co., No. C-04-603, District Court of Pontotoc County, on September 8, 2005 for the defendant and its attorney, David Donchin; Cordova v. Oklahoma Farm Bureau Ins. Co., No. CJ-2008-1557,

5

District Court of Oklahoma County on November 16, 2009 for plaintiff and her attorney Gregg W. Luther; Cearley v. Great American Ins. Co. of New York, No. CJ-2008-1202, District Court of Creek County on January 21, 2010 for plaintiff and his attorneys, W.G. "Gil" Steidley and Whitney Eschenheimer; Tate v. Allstate Ins. Co., Case No. 10-CV-104-R, United States District Court, Western District of Oklahoma on February 16, 2011, for the plaintiff and his attorney, Gregg W. Luther; Sherwood Construction Company, Inc. v. American Home Assurance Company, et al., Case No. 5:09-cv-1395-HE, United States District Court for the Western District of Oklahoma on April 13, 2011, for the defendants and their attorney, Linda M. Szuhy and Ellen Mary Van Meir; David Gregory Miller v. Farmers Ins. Grp., et al., Case No. CIV-10-466-F, United States District Court for the Western District of Oklahoma, on July 8, 2011, for the plaintiff and his attorneys Logan Johnson and Brad Miller, Miller & Johnson; Steven Hayes v. State Farm Fire & Casualty Co.., Case No. 10-CV-680-HE, United States District Court for the Western District of Oklahoma, on September 13, 2011, for plaintiff Steven Hayes and his attorney Rachel Bussett; Gary Billings v. Conseco Health Ins. Co., Case No. 10-CV-372-M, United States District Court for the Western District of Oklahoma, on January 31, 1012, for plaintiff Gary Billings and his attorney, Simone Gosnell Fulmer, The Fulmer Group; Dean Brunken et al v. Employers Mut. Cas. Co., et al., Case No. CJ-2009-9614, District Court of Oklahoma County, Oklahoma, on February 3, 2012, for plaintiff Dean Brunken and his attorney, Kent McGuire; Janet McDonald v. Great American Life Ins. Co., Case No. 12-CV-00012-D, United States District Court for the Western District of Oklahoma, on September 28, 2012, for plaintiff Janet McDonald and her attorney, Patrick M. Ryan; Cactus Drilling Co. LLC v. National Union Fire Insurance. Co. of Pittsburgh PA, et al., Case No. 12-CV-191-M, United States District Court for the Western District of Oklahoma, on October 14, 2013, for defendant National Union Fire Insurance Company and its attorney, Darin L. Brooks, Gray, Reed & McGraw; L P D Energy Co. LLC v. Mid Continent Casualty Company, Case No. CJ-2011-2577, District Court of Tulsa County, Oklahoma, on October 22, 2013, for defendant Mid Continent Casualty Company and its attorney, Roger N. Butler, Jr.; SRM, Inc. v. Great American Insurance Company, Case No. 11-CV-1090-F, United States District Court for the Western District of Oklahoma, on January 23, 2014, for defendant Great American Insurance Company and its attorney, Roger N. Butler, Jr.; Elizabeth A. Roberts v. Safeco Ins. Co. of America, Case No. CJ-2012-1051, District Court of Oklahoma County, Oklahoma, on February 24, 2015 for plaintiff Elizabeth A. Roberts and her attorney, Simone Fulmer; Rebecca Zeavin v. USAA Cas. Ins. Co. et al., Case No. CJ-2011-7887, District Court of Oklahoma County, Oklahoma, on February 26, 2016, for plaintiff Rebecca Zeavin and her attorney, Simone Fulmer; Wade Lavoy v. USAA, Case No. CJ-2014-131, District Court of Jackson County, Oklahoma, on April 9, 2016 for plaintiff Wade Lavoy and his attorney, Simone Fulmer; Eric LaFollette et al. v. Liberty Mut. Fire Ins. Co., Case No. 14-CV-04147-NKL, United States District Court for Missouri, Central Division on April 11, 2016 for plaintiffs Eric LaFollette and Camille LaFollette and their attorney, Derrick Morton; Fulton v. Ozarks Electric, Case No. CJ-2011-100, District Court of Adair County, Oklahoma on June 17, 2016 for defendant/third party plaintiff Ozark Electric and its attorney Richard Hornbeek; Seeley v. Ozark Elec. Coop. Corp., et al., Case No. CJ-2011-100, District Court of Adair County, Oklahoma, June 17, 2016 for third party defendant Federated Rural Electric Insurance Exchange and its attorney Richard E. Hornbeek; Rose Marie Carrier v. United Services Auto. Association and USAA Casualty Insurance Company, Case No. CJ-2013-2547, District Court of Tulsa County, Oklahoma, on February 23, 2017, for plaintiff Rose Marie Carrier and her attorney Simone Fulmer; Dee Ann Harper v. United Services Auto. Association and United Services Auto. Association Casualty Insurance Company, Case No. CJ-2012-5890, District Court of Oklahoma County, Oklahoma, on February 23, 2017, for plaintiff Dee Ann Harper and her attorney Simone Fulmer; Rodney Stewart v. Brotherhood Mutual Insurance Company, Case No. 16-CV-00488, United

Bowers_Mort Welch 00077

States District Court for the Northern District of Oklahoma, on November 27, 2017, for plaintiff Rodney Stewart and his attorney Simone Fulmer; <u>Reinaldo Lozano v. Golden Rule Insurance Company</u>, Case No. CIV-15-1230-F, United States District Court for the Western District of Oklahoma, on November 30, 2017, for plaintiff Reinaldo Lozano and his attorney Simone Fulmer; <u>Powell v. American Farmers & Ranchers Mutual Insurance Company</u>, Case No. CJ-2016-64, District Court of Custer County, Oklahoma, August 22, 2018, for American Farmers & Ranchers Mutual Insurance Company and its attorney Kayce Gisinger; <u>Greenway Park v. Nautilus Ins. Co.</u>, Case No. CJ-2016-754, District Court of Cleveland County, Oklahoma, November 2, 2018 for plaintiff and its attorneys Logan Johnson and Brad Miller; <u>Taylor v. AIG Property & Cas. Co., et al.</u>, Case No. 17-CV-525-GKF, United States District Court for the Northern District of Oklahoma, on June 10, 2019, for the plaintiff and her attorneys, Whitten Burrage; <u>Shackelford v. American Income Life Ins. Co.</u>, Case No. CIV-18-0456-H, United States District Court for the Western District of Oklahoma, on June 24, 2019 for the plaintiff and her attorney, Jacob Rowe of Fulmer/Sill.

 Testimony at trial as an expert witness in the following insurance coverage and bad faith cases: <u>Anders v. GEICO</u>; <u>Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co.</u>; <u>Tate v. Allstate Ins. Co.</u>; <u>David Gregory Miller v. Farmers Ins. Grp., et al.</u> (hearing on class certification); <u>Wade Lavoy v. USAA</u>, Case No. CJ-2014-131, District Court of Jackson County, Oklahoma; <u>Nelson v. Granite States Ins. Co.</u>, Case No. CIV-08-1165, United States District Court for the Western District of Oklahoma; and <u>Rose Marie Carrier v. United Services Auto. Assoc. and USAA Casualty Ins. Co.</u>, Case No. CJ-2013-2547, District Court of Tulsa County, Oklahoma.

 Testimony by deposition in two legal malpractice cases: <u>Wheat v. Richardson, et al.</u>, No. CJ-07-7248, District Court of Tulsa County, on October 13, 2009, for the defendants and their attorney, James M. Secrest II; and <u>The Gray Ins. Co. v. Rodney J. Heggy</u>, No. CIV-11-733-C, United States District Court for the Western District of Oklahoma, on October 10, 2012 for the plaintiff The Gray Insurance Company and its attorney, Robert J. Killeen, Jr.; Oklahoma Insurance Department, expert testimony on various issues.

## XI. COMPENSATION

 $295 per hour for all services rendered, whether in or out of court.

**Bowers_Mort Welch 00078**